**Robert L. BASTIAN, on behalf of himself and all others similarly situated, and as a derivative action on behalf of the shareholders of Lakefront Realty Corporation, Plaintiff-Appellant,**

v.

**LAKEFRONT REALTY CORPORATION, an Illinois Corporation, and Joseph N. Scanlan, an Individual, Defendants-Appellees,**

**and**

**Northwestern University, Intervening Defendant-Appellee.**

**Nos. 77–2065, 77–2066.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1978.

Decided Aug. 9, 1978.

Richard T. Zwirner, Chicago, Ill., for plaintiff-appellant.

Robert A. Downing, Sidney Z. Karasik, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and PELL and WOOD, Circuit Judges.

PELL, Circuit Judge.

The Lake Shore Club of Chicago (the Club) is a private social and athletic organization which, at the time this case was filed, occupied the land and the 18-story building known as 850 Lake Shore Drive in Chicago. Lakefront Realty Corporation (Lakefront) was formed by the Club in 1947 as a separate corporation to hold and maintain the 850 property and to lease it to the Club. Only Club members were eligible to own Lakefront stock. Lakefront was given the right, which it exercised, to name an Executive Director of the Club, who had significant veto powers over Club affairs. Appellant Bastian owns 20 shares of the stock of Lakefront. Appellee Scanlan is President, Executive Director under the lease, and principal shareholder (22%) of Lakefront.

On March 31, 1977, Lakefront entered into a contract to sell the 850 property to intervening appellee Northwestern University (Northwestern) for $7,500,000. That same day, Scanlan dispatched a three-page letter to Lakefront shareholders on behalf of the Board of Directors. The letter recited unsuccessful negotiations between Lakefront and the Club on a lease of the 850 property after June 30, 1977, when the prior lease expired. The efforts of Lakefront officers to pursue several prospects for the purchase of the property were mentioned. The Northwestern offer was described as an "extremely good" one, and Scanlan conveyed the Board's recommendation that the shareholders vote to accept the offer at a specially called May 10 meeting. A single page was attached to the letter, containing a notice of the meeting and a proxy.

The affirmative votes of 131,080 of the outstanding 196,620 shares were required to approve the sale. 135,000 affirmative votes were cast. Per the March 31 contract, the sale was to be consummated on July 1, 1977.

On May 9, Bastian filed the complaint in this action. Count I, which is most directly pertinent on this appeal, alleged violations of the proxy solicitation requirements of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a),[1] and the rules promulgated thereunder and by the Securities and Exchange Commission. Count II alleged a failure to register the stock of Lakefront with the Commission, as required by Section 12(g)(1) of the Act, 15 U.S.C. § 78*l*(g)(1). Counts III and IV complained of the failure to file reports on corporate finances and insider stockholdings required by Section 13(a), 15 U.S.C. § 78m(a), and Section 16(a), 15 U.S.C. § 78p(a). Counts V through VII invoked pendent state claims, sounding in fraud and breach of fiduciary duty.

The district court obtained the agreement of the parties that the sale of the 850 property would not be closed before July 15, 1977, so the Club could have a last chance to match Northwestern's offer and exercise a right of first refusal given by the lease. On June 24, the court announced its view that the May 10 stockholders' meeting was not subject to the proxy requirements of the Act. Because this conclusion indicated little likelihood of success on the merits, and Lakefront stockholders *qua* stockholders would not suffer irreparable injury if the property was sold, the court denied Bastian's motion for preliminary injunction against the closing.[2] After the Club failed to meet Northwestern's offer, the ruling was formally entered on July 1. Thereafter, the court dismissed Count I, certifying the dismissal as a final judgment and that there was no just reason for delay of the appeal therefrom. *See* Fed.R.Civ.P. 54(b).

## I.

The proxy requirements of Section 14(a) apply only to securities registered under the

Act. There is no dispute that the proxy requirements were not met here, but appellees insist there was no obligation to meet them.

They argue that there was never an obligation to register the Lakefront stock under Section 12(g)(1), which extended the duty to register to

> [e]very issuer which is engaged in interstate commerce, or in a business affecting interstate commerce, or whose securities are traded by use of the mails or any means or instrumentality of interstate commerce . . .
>
> .     .     .     .     .
>
> (B) within one hundred and twenty days after the last day of its first fiscal year ended after two years from July 1, 1964, on which the issuer has total assets exceeding $1,000,000 and a class of equity security . . . held of record by five hundred or more but less than seven hundred and fifty persons . . . .

The parties agree that on June 30, 1967, this provision became effective as to Lakefront, in that on said date, Lakefront had assets exceeding $1,000,000 and stock held by slightly more than five hundred persons. Three arguments are nonetheless advanced to avoid the impact of Section 12(g)(1).

Appellees say that Congress "hardly" could have intended to require registration by a corporation engaged in the sole business of owning, maintaining, and leasing a property used only as a private social and athletic club. It may be that such enterprises were far from foremost in the minds of the members of Congress when it enacted the 1964 amendments to Section 12, but the language enacted into law plainly leaves no room for an implied exemption on this ground, and nothing from the legislative history to support one is cited to us.

---

1. The requirements of Section 14(a) apply only to securities registered under Section 12, 15 U.S.C. § 78*l*. The question before us here is whether Lakefront securities should be treated as if registered and, thus, whether Section 14(a) applies at all. There is no dispute that Section 14(a) was violated if it did apply.

2. An order in related state court proceedings nonetheless delayed the closing until August 29. Immediately thereafter, Northwestern took possession and made many residential leases with students for the 1977–1978 academic year.

Appellees urge us to hold that Lakefront did not satisfy the jurisdictional interstate commerce requirement. The district court rejected this argument, as do we. There is ample undisputed evidence in the record that, although stockholders wishing to dispose of stock would indicate this fact with a notice on a bulletin board in the Club, many of the steps in accomplishing the sale would typically be conducted with the use of the mails. Moreover, given Lakefront's extensive powers to control many of the affairs of the Club, and the facts that the Club operated restaurant and bar facilities undoubtedly using the products of interstate commerce, provided hotel-type accommodations for Club members and out-of-state visitors, and rented portions of the premises for conventions attended by out-of-state visitors, we would be unable to say that Lakefront's business had no effect on interstate commerce.

Appellees next assert that since at least October 1968, Lakefront stock has been held by less than 500 persons. The relevance of this fact frankly escapes us. Congress recognized that the shareholders of a Section 12(g) corporation might fall below 500, but it provided that deregistration would not be available until the shareholders numbered less than 300. Section 12(g)(4), 15 U.S.C. § 78*l*(g)(4). If Lakefront had registered as required its registration status would have remained unchanged by virtue of dropping under the requisite 500.

Appellees prevailed in the district court on the theory that Lakefront, even if it had properly registered its stock, would have been entitled to deregistration under Section 12(g)(4) as of October 1976, when there were less than 300 stockholders in the company. Section 12(g)(4) provides that:

Registration of any class of security pursuant to this subsection [12(g)] shall be terminated ninety days, or such shorter period as the Commission may determine, after the issuer files a certification with the Commission that the number of holders of record of such class of security is reduced to less than three hundred persons. The Commission shall after notice and opportunity for hearing deny termination of registration if it finds that the certification is untrue. Termination of registration shall be deferred pending final determination on the question of denial.

Our research confirms the parties' suggestion that there is a lack of direct authority applying this provision, but its language is plain enough. An issuer is entitled to deregistration if the security in question is held by less than 300 persons. The Commission has no more discretion to deny deregistration if this condition is met than it has to allow it if the condition is not met.[3] Lakefront thus could have obtained deregistration within 90 days of October 1, 1976,[4] and the proxy requirements of Section 14(a) would not have applied to the March 31, 1977, letter and solicitation, and the May 10, 1977, meeting.

Bastian argues that the purposes of the Act, and of the registration, reporting, and proxy requirements in particular, were to assure disclosure of all information pertinent to intelligent investment decisions and the exercise of the rights of corporate democracy. That such were the purposes, and that they are commendable, is not disputed. The fact remains that Congress drew a line to effectuate them, under which firms with less than 500 shareholders need never register, report, or comply with the proxy rules, and firms which once did these things may

---

3. Bastian suggests that if Lakefront had applied to the Commission for "deregistration" (perhaps more accurately, some sort of certification that such would have been appropriate), the Commission probably would have denied it at least until all reports which Lakefront had been required and had failed to prepare had been filed. There is no suggestion, however, that the Commission has ever thought to use its termination authority in this way, and there is no warrant in Section 12(g)(4) for such use.

4. We need not pile speculation on speculation by wondering about the possibility that the Commission might have delayed termination pending proof of the true fact that less than 300 stockholders existed.

cease doing them once termination is accomplished.[5] To argue that Lakefront, despite never having registered its stock, and being clearly entitled to termination of registration (and freedom from the proxy requirements) if it had registered, had to apply for "deregistration" is to call for the doing of an idle and useless act. Nothing in the pertinent statutes suggests that Congress intended an exception to the usual rule that the law does not require such acts. The remedy for Lakefront's and Scanlan's violations of the Act's requirements before October 1976 is directly to assert their liability therefor, as has been done in the counts of the complaint that the district court continues to entertain, not to twist Section 12(g)(4) and thus invoke proxy requirements from which Lakefront had every entitlement to be free.

The authorities invoked by Bastian do not suggest a different conclusion. Principal reliance is placed on *Reserve Life Insurance Company v. Provident Life Insurance Company*, 499 F.2d 715 (8th Cir. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 803 (1975), in which the court held that certain voting trust certificates were securities required to be (but which were not) registered under Section 12(g)(1), and that solicitations of consents to extend the trust were thus subject to the proxy rules of Section 14(a). The court did hold that a corporation *at all pertinent times subject to registration and proxy requirements* could not escape the latter merely because they are literally applicable only to solicitations of proxies for "registered" securities. The distinction from this case, however, is clear. The corporation in *Reserve Life* had no defense to the registration or proxy rules to which Congress clearly intended it be subject, other than the very fact of its violations.[6]

*Schnorbach v. Fuqua*, 70 F.R.D. 424, 441 (S.D.Ga.1975), is to the same effect, holding that once a corporate security is subject to registration under Section 12(g) (even though the registration did not occur until later) the corollary obligations of Section 13(d)(1), 15 U.S.C. § 78m(d)(1), become effective. *Schnorbach* implies nothing pertinent to the facts involved in Count I here, where clear entitlement to termination of registration (and its corollary proxy obligations) preceded the proxy solicitation.

Bastian also invokes two letter rulings of the Securities and Exchange Commission which do relate to termination of registration, but neither advances his argument. In *Buffums'* (SEC No-Action Letter, May 6, 1974), a corporation sought and obtained deregistration after the close of its fiscal year. Relying on the mandatory language of Commission Rule 13a–1, the Commission declined to relieve the corporation of its vested duty to file a Form 10-K report covering the fiscal year, even though the actual filing date came after deregistration was accomplished. The point, of course, is that the duty arose from and concerned only a year during which the Act required disclosure of corporate affairs.

*American Fidelity Life Insurance Company*, CCH Fed.Sec. Law Rptr. ¶ 78,054 at 80,298 (1970–71 Transfer Binder), involved a company which had voluntarily registered its securities even though it would have been entitled to an exemption from registration. The company's letter request asserted that the voluntary nature of its registration left it free to ignore the proxy rules of Section 14(a). The Commission disagreed, stating that once registration was effected, even voluntarily, and its resulting obligations were incurred, the obligations could not be ignored without first obtaining either deregistration or a formal exemption as provided for in Section 12(h). This authority comes closest to supporting Bastian's position, but ultimately fails to do so because following the statutory deregistration or exemption procedures in *American Fidelity* would not have been the useless and meaningless act that it would be here.

---

5. We refer here, of course, only to those firms whose obligations to register, etc., arise solely from Section 12(g).

6. Ours would obviously be a very different case if Lakefront continued to be subject to the registration requirement.

Once a security has been registered with the Commission, investors and stockholders develop perfectly justifiable expectations and confidence that the resulting obligations will be satisfied. To allow a corporation to foster and benefit from such confidence and then, at its discretion, to betray it would create manifest unfairness.

For the reasons stated, we conclude that on the undisputed facts judgment as a matter of law was appropriately entered in appellees' behalf on Count I of the complaint.

## II.

We turn to Bastian's appeal from the denial of a preliminary injunction. Northwestern argues as a preliminary matter that the appeal is moot, because the 850 property has already been sold and Northwestern has leased the residential quarters to many students for the 1977–1978 academic year. It is true enough that the specific injunction against closing the sale would now come too late. On the other hand, "[i]t has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the *status quo*." *Porter v. Lee*, 328 U.S. 246, 251, 66 S.Ct. 1096, 1099, 90 L.Ed. 1199 (1946). Because this "court has jurisdiction of the parties and [Northwestern] has possession and control of the assets [in question], we would have jurisdiction to compel restoration, if ultimately we should determine that the circumstances of the case require that result." *Ramsburg v. American Investment Company of Illinois*, 231 F.2d 333, 336 (7th Cir. 1956). The matter is therefore not moot.[7]

Northwestern cites *In the Matter of Abingdon Realty Corporation*, 530 F.2d 588 (4th Cir. 1976); *Fink v. Continental Foundry & Machine Company*, 240 F.2d 369 (7th Cir. 1957), *cert. denied*, 354 U.S. 938, 77 S.Ct. 1401, 1 L.Ed.2d 1538; *Sobel v. Whittier Corp.*, 195 F.2d 361 (6th Cir. 1952); and *Taylor v. Austrian*, 154 F.2d 107 (4th Cir.

1946), to support its argument, but these cases are readily distinguished. In *Abingdon, Fink*, and *Taylor*, the sales sought to be enjoined were to *parties not before the courts*, and the consummation of the sales placed the properties in question beyond the reach of the courts' equitable powers. In *Sobel*, a merger presented an analogous situation, where the merging firm, a mortgagee which supplied the funds to pay off the firm's creditors, and the creditors, were not parties to the action. In such circumstances, to keep the controversy within the effective remedial powers of the court, a party with reason to fear consummation of the action to be enjoined must seek and obtain a stay or injunction pending appeal under Fed.R.Civ.P. 62, as the courts in *Fink* and *Sobel* pointed out. Where, as here, the action can be undone by orders directed to parties before the court, the situation is quite different. *See Ramsburg, supra* at 338.

In *Brill v. General Industrial Enterprises, Inc.*, 234 F.2d 465 (3d Cir. 1956), a final injunction against the sale of corporate assets was denied after a full hearing. Although the purchaser was a party, the appellate court denied review on the basis of mootness, emphasizing that the mere filing of an appeal does not itself operate to stay the effectiveness of the decree appealed. The fact that the court treated a request to supplement the pleadings by requesting relief to undo the sale as a "new" claim not properly asserted at that late stage in the litigation, *see id.* at 470, may indicate that the court was only addressing the narrow mootness question of the injunction against closing the sale. If so, *Brill* could be reconciled with *Porter v. Lee* and *Ramsburg*, both *supra*. If a broader ruling was intended, we decline to follow it and adhere to the holding in *Ramsburg*, decided the same year, that such an appeal is not moot if the court has appropriate jurisdiction over the parties and the subject matter to effect relief.

---

7. *Ramsburg* makes explicit that it does not matter whether the injunction denial is on the merits or, as here a disposition of a claim for interlocutory relief. 231 F.2d at 336–37.

We also reject Northwestern's argument that its student housing leases amount to such intervening contract rights that no relief could be effected. For one thing, such leases are quite different from the loss of control of the property that would have been presented if there had been a sale to outsiders. For another, the leases in question cover only the 1977–1978 academic year. We do not doubt that such leases might be a factor to consider in deciding how to grant injunctive relief, but their existence does not moot the case.

█ We turn then to the merits. Our review of a district court's decision to deny a preliminary injunction is properly limited to determining whether the court abused its discretion. *American Medical Association v. Weinberger*, 522 F.2d 921, 924 (7th Cir. 1975). We find no abuse of discretion here. The district court indicated that its denial was based upon a lack of probability of success on the merits and a lack of irreparable injury to Lakefront shareholders *qua* shareholders. We think both conclusions are sound.

Count I of Bastian's complaint alleges, as we have said, that shareholder approval of the sale was obtained in violation of applicable proxy rules. Because Count I involves the only federal claim directly related to the shareholder approval, the district court's dismissal of that count, which we have affirmed, makes it very unlikely Bastian would prevail on the merits of his injunctive relief request. He, indeed, concedes as much. His only attack on this ground for denying the injunction is the assertion that the district court was wrong as a matter of law in dismissing Count I.

█ We also believe irreparable injury to the stockholders is very difficult to find in the circumstances of this case. To be sure, the denial of injunctive relief meant that the Club has lost its clubhouse. It would be possible for the Club to argue, as Bastian does, that realty is unique and its

loss irreparable. But Bastian appears here not as a representative of the Club, but as a Lakefront shareholder invoking the corporate interest. Notwithstanding that there was a special historical relationship between Lakefront and the Club, it is quite plain that the interests of the two were never perceived to be identical. Those Club members who chose to capitalize the enterprise by purchasing shares in Lakefront have a distinct financial interest that is reflected both in the separate corporation formed to own the 850 property and in the substantial veto power given to Lakefront over Club affairs. If Lakefront shareholders, *as shareholders*, have suffered injury from Lakefront's and Scanlan's failure to register Lakefront stock and report its affairs, we agree with the district court that money damages will be adequate to compensate them.[8]

For the reasons we have given, we affirm the district court's dismissal of Count I and its denial of preliminary injunctive relief.

---

8. The court did, *e. g.*, indicate its willingness to enjoin distribution of the proceeds of the sale until the damage claims could be adjudicated, and noted that Scanlan's 22% share of the net proceeds would provide a healthy fund for the satisfaction of any damages for which he might be liable.