**COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,**

v.

**Jack W. SAVAGE et al., Defendant-Appellant.**

**No. 77–2930.**

United States Court of Appeals, Ninth Circuit.

Nov. 20, 1979.

Rehearing Denied Jan. 23, 1980.

Joel J. Bellows, Chicago, Ill., on brief; Charles B. Bernstein, Bellows & Associates, Chicago, Ill., for defendant-appellant.

Gregory C. Glynn, Commodity Futures Trading Comm., Washington, D. C., for plaintiff-appellee.

Before HUFSTEDLER and SNEED, Circuit Judges, and RENFREW,* District Judge.

SNEED, Circuit Judge:

This appeal raises several questions regarding the proper interpretation of the Commodity Exchange Act (Act), 7 U.S.C. §§ 1–24. Defendant-appellant Savage appeals from an order and judgment of permanent injunction entered on a motion for summary judgment. Savage was one of several defendants in an action brought by the Commodity Futures Trading Commission (CFTC) in the United States District Court for the Central District of California. Each of the other defendants have consented to permanent injunctions or have not pursued appeals. The district court on May 6, 1977 permanently enjoined appellant Savage from engaging in future violations of antifraud, fictitious sale and commodity trading-advisor registration provisions of the Act. We note jurisdiction under 28 U.S.C. § 1291 and affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

A. *Overview of the Commodity Exchange Act.*

On October 23, 1974, to remedy perceived abuses in commodity transactions, Congress extensively amended the Commodity Exchange Act by enacting the Commodity Futures Trading Commission Act of 1974, Pub. L.No.93–463, 88 Stat. 1389. The 1974 Act created the CFTC, an independent federal regulatory agency, to administer the Act and enforce its provisions. Congress determined that "[t]he public interest . . . requires that these markets operate under close scrutiny so that they serve their legitimate market functions." H.R.Rep.No.93–975, 93rd Cong., 2d Sess. 34 (1974). The CFTC, as one aspect of this scrutiny, was empowered to go directly into federal court to seek injunctive relief restraining any person from violating the Act. 7 U.S.C. § 13a–1. The substantive content of the regulatory framework for commodity market professionals created in 1974 included a broad definition of the term "commodity trading advisor,"[1] registration and record-

---

* Honorable Charles B. Renfrew, United States District Judge for the Northern District of California, sitting by designation.

1. The definition of "commodity trading advisor" is found in 7 U.S.C. § 2, which provides in pertinent part:

 The term "commodity trading advisor" shall mean any person who, for compensation or profit, engages in the business of advising others, either directly or through publications or writings, as to the value of commodities or as to the advisability of trading in any commodity for future delivery on or subject to the rules of any contract market, or who for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning commodities; but does not include (i) any bank or trust company, (ii) any newspaper reporter, newspaper columnist, newspaper editor, lawyer, accountant, or teacher, (iii) any floor broker or futures commission merchant, (iv) the publisher of any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation including their employees, (v) any contract market, and (vi) such other persons not within the intent of this definition as the Commission may

keeping requirements,[2] and antifraud standards analogous to those in other federal securities laws.[3]

## B. *The Complaint.*

The CFTC brought this action July 1, 1976 under 7 U.S.C. § 13a–1. The complaint contained six counts, only three of which apply to the appellant. It sought preliminary and permanent injunctions against appellant, the American International Trading Company (AITC), and twelve other individual defendants, including employees of AITC and floor brokers at the MidAmerica Commodity Exchange (MACE), a contract market registered with the CFTC. Appellant Savage was a member of MACE; he traded on the floor for his own account and was not registered in any capacity with the CFTC. The complaint charged appellant and others with various fraudulent activities which operated to defraud the customers of AITC. All of the defendants except appellant and two others, all of whom resided in Chicago and worked at MACE, also in Chicago, allowed consent decrees to be entered against them.

Only three counts—III, IV and V—contain allegations against the appellant:

■ 1. *Count III.* In Count III, the complaint alleged that Savage and others violated prohibitions against fraud and fictitious sales contained in sections 4b and 4c of the Act, 7 U.S.C. §§ 6b & 6c.[4] The

specify by rule, regulation, or order: *Provided,* That the furnishing of such services by the foregoing persons is solely incidental to the conduct of their business or profession.

2. The Act requires many persons to register through separate provisions: 7 U.S.C. § 6d (futures commission merchants); 7 U.S.C. § 6e (floor brokers); 7 U.S.C. § 6k (associates of futures commission merchants); and 7 U.S.C. § 6m (commodity trading advisors and commodity pool operators). Record keeping requirements for these persons are similarly diverse, *e. g.* & 7 U.S.C. §§ 6g, 6i & 6n.

3. *See* Part IVC *infra.*

4. These sections provide:
§ 6b. Contracts designed to defraud or mislead; bucketing orders; buying and selling orders for commodities
It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) to cheat or defraud or attempt to cheat or defraud such other person;
(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or
(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.
Nothing in this section or in any other section of this chapter shall be construed to prevent a futures commission merchant or floor broker who shall have in hand, simultaneously, buying and selling orders at the market for different principals for a like quantity of a commodity for future delivery in the same month, from executing such buying and selling orders at the market price: *Provided,* That any such execution shall take place on the floor of the exchange where such orders are to be executed at public outcry across the ring and shall be duly reported, recorded, and cleared in the same manner as other orders executed on such exchange: *And provided further,* That such transactions shall be made in accordance with such rules and regulations as the Commission may promulgate regarding the manner of the execution of such transactions.
§ 6c. Prohibited transactions—Commodities specifically listed

complaint charged that Savage, by arrangement, took the opposite side of commodity contract trades from AITC customers in two contexts. First, the complaint charged that a series of prearranged transactions in soy beans and silver occurred on April 17 and 18, 1975. In these transactions, Savage bought contracts when contracts were sold for the account of customers of the AITC Managed Account Program, and Savage sold futures contracts simultaneously with the purchase of futures contracts for the accounts of AITC customers. Savage sustained losses with respect to AITC customers who had deficits in their accounts and enjoyed profits on transactions with AITC customers who had credit balances in their accounts.[5] As a net effect of these transactions, Savage's losses and gains substantially offset, leaving him with only a small gain, and AITC customer funds shifted between accounts.[6] In addition, Count III alleged that during at least the period July 9 to September 9, 1975, Savage engaged in or aided and abetted prearranged trades between himself and AITC customers. Savage allegedly profited by becoming the buyer in respect to AITC customer sell orders and the seller in respect to AITC customer buy orders.

2. *Count IV.* The complaint alleged in Count IV that since April 21, 1975, Savage violated section 4m of the Act, 7 U.S.C. § 6m,[7] by operating as a commodity trading

---

(a) It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity, which is or may be used for (1) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (2) determining the price basis of any such transaction in interstate commerce in such commodity, or (3) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) If such transaction is, is of the character of, or is commonly known to the trade as, a "wash sale," "cross trade," or "accommodation trade," or is a fictitious sale;

(B) If such transaction involves any commodity specifically set forth in section 2 of this title, prior to the enactment of the Commodity Futures Trading Commission Act of 1974, and if such transaction is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", or

(C) If such transaction is used to cause any price to be reported, registered, or recorded which is not a true and bona fide price.

Nothing in this section shall be construed to prevent the exchange of futures in connection with cash commodity transactions or of futures for cash commodities, or of transfer trades or office trades if made in accordance with board of trade rules applying to such transactions and such rules shall have been approved by the Commission.

. . . . .

5. On April 21, 1975, the Commodity Futures Trading Commission Act of 1974 extended the segregation requirements for all futures commission merchants such as AITC to include all transactions in commodities for future delivery, including transactions in previously unregulat-

ed commodities. As a result of this extended requirement, AITC needed an additional $10,-000 as of that date to meet the segregation requirements for existing accounts. (C.T. 1058.) Rather than raise this additional capital, the CFTC alleges that AITC sought to reduce its segregation requirements by reducing the amounts that it owed to customers of its managed account program. The CFTC alleges that it accomplished this by, in effect, transferring gains that it had made through investments for some customers' accounts to the accounts of those for whom investments had been unsuccessful. This transfer allegedly occurred through appellant Savage who acted as a middleman.

6. The CFTC alleged, as noted in n. 5 *supra,* that these trades were effected to avoid the need for $10,000 to meet extended segregation of funds requirements which became applicable April 21, 1975. The 1974 Commodity Futures Trading Commission Act extended those commodities over which the CFTC had jurisdiction. It is undisputed that prior to April 21, 1975 the CFTC had no jurisdiction over silver futures transactions. Appellant has attacked the district court judgment, contending that this lack of jurisdiction deprives the CFTC of the authority to act in the April 17 and 18, 1975 trades. Appellant is correct, but only in part. Evidence of the silver futures transactions was material to prove improper trading in soy beans, over which the CFTC did have jurisdiction. The record reveals no affirmative injunctive relief given to the CFTC in connection with the silver futures, thus there was no error. *See* C.T. at 4007.

7. This section provides:

§ 6m. Same; use of mails or other means or instrumentalities of interstate commerce

advisor without registering with the CFTC. The CFTC takes the position that Savage operated as an advisor to the customers of AITC's Managed Account Program through Melvin Berman, who made the investment decisions for AITC accounts. The complaint also alleged that Savage prepared portions of a commodity advisory letter.

3. *Count V.* Count V charged violations of section 4o of the Act, 7 U.S.C. § 6o.[8] That section forbade a commodity trading advisor "registered under this Act . . . to employ any device, scheme, or artifice to defraud any client . . . or . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client . . . ." The specific actions alleged to constitute the violation were those outlined in Count III of the complaint.

> It shall be unlawful for any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator: *Provided*, That the provisions of this section shall not apply to any commodity trading advisor who, during the course of the preceding twelve months, has not furnished commodity trading advice to more than fifteen persons and who does not hold himself out generally to the public as a commodity trading advisor. The provisions of this section shall not apply to any commodity trading advisor who is a (1) dealer, processor, broker, or seller in cash market transactions of any commodity specifically set forth in section 2 of this title prior to the enactment of the Commodity Futures Trading Commission Act of 1974 (or products thereof) or (2) non-profit, voluntary membership, general farm organization, who provides advice on the sale or purchase of any commodity specifically set forth in section 2 of this title prior to the enactment of the Commodity Futures Trading Commission Act of 1974; if the advice by the person described in clause (1) or (2) of this sentence as a commodity trading advisor is solely incidental to the conduct of that person's business: *Provided*, That such person shall be subject to proceedings under section 18 of this title.

**8.** Section 4o of the Act now reads as follows:
> § 6o. Same; fraud; misrepresentation

**C.** *Proceedings and Issues Below.*

With its complaint, the CFTC filed eleven lengthy affidavits of its investigators, AITC customers, and a former AITC employee. Seven more affidavits were filed July 15, 1976. A preliminary injunction issued July 16, 1976, restraining appellant from violating section 4b of the Act by cheating or attempting to cheat a customer by making false reports or engaging in offsetting trades with a customer; from engaging in "wash" or accommodation trades; from holding himself out to the public as a commodity trading advisor without being registered pursuant to section 4m of the Act; from taking the offsetting position from that of customers of AITC and engaging in fictitious trades involving the accounts of AITC customers while acting as a commodity trading advisor to AITC, in violation of section 4o of the Act.[9] (C.T. at 783.)

> (1) It shall be unlawful for any commodity trading advisor or commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.
> (2) It shall be unlawful for any commodity trading advisor or commodity pool operator registered under this chapter to represent or imply in any manner whatsoever that he has been sponsored, recommended, or approved, or that his abilities or qualifications have in any respect been passed upon by the United States or any agency or officer thereof: *Provided*, That this section shall not be construed to prohibit a statement that a person is registered under this chapter as a commodity trading advisor or commodity pool operator, if such statement is true in fact and if the effect of such registration is not misrepresented.

Prior to its 1978 amendment, it read the same except that the phrase "registered under this Act" followed after the term "any commodity trading advisor or commodity pool operator." *See* Part IVA *infra.*

**9.** Appellant has raised the question of error in the district court's entry of the preliminary injunction against him. We do not need to reach this issue, as it is moot. *See Plaquemis Parish School Board v. United States,* 415 F.2d

At the time the preliminary injunction issued against appellant, final judgments and orders of permanent injunction were entered against all defendants except appellant, Ferrara and Wozniak. On August 5, 1976, appellant filed a motion to dismiss for lack of jurisdiction, motion to dismiss, and an alternative motion to ʻtransfer the action to Chicago, where all the remaining defendants worked and resided. The supposed lack of jurisdiction was premised upon the special venue provision in section 6c of the Act, 7 U.S.C. § 13a–1, which provides that the CFTC can bring an action "in the district wherein the defendant is found . . . or where the act or practice occurred, is occurring, or is about to occur . . . ." In the alternative, appellant requested that the action be transferred pursuant to 28 U.S.C. § 1404(a). Appellant's motion to dismiss Counts IV and V argued that he did not furnish advice to more than fifteen persons and that since he was properly not registered as a trading advisor, section 4o of the Act did not apply to him. Appellant's motions were denied September 20, 1976.

Appellant then answered the complaint October 12, 1976, denying all the allegations save that he was not registered as an advisor. The CFTC then filed a motion for summary judgment, supplying 115 proposed findings of fact based upon its affidavits, as to which it argued no genuine issue of fact existed. (C.T. at 1057.) Appellant Savage filed an affidavit in opposition to the summary judgment motion. (C.T. at 981–83.) He disputed only 34 of the 115 findings. Most critically, Savage:

1) Denied that he arranged with Ferrara and Wozniak to execute orders from AITC customers that he prepared;

2) Denied "knowingly" entering into trades with AITC customers "away from the market price;"

3) Denied entering into trades *with the intention* of transferring balances between AITC customers;

4) Claimed that he never advised AITC customers as to commodity investments; and,

5) Claimed that he never dictated market trading advice after July 17, 1975 for use in a market letter.

On May 5, 1977, the district court entered its order and judgment of permanent injunction against the three remaining defendants. From this final order appellant Savage timely filed his notice of appeal on July 5, 1977.

We shall discuss first in Part II appellant's jurisdiction contentions. Thereafter, in Part III, we will concern ourselves with appellant's arguments in support of his motion to dismiss Count IV. Finally, we will address, in Part IV, the propriety of summary judgment with respect to Counts III and V.

## II. JURISDICTION AND VENUE

The CFTC asserts jurisdiction in the District Court of the Central District of California properly. It relies upon 7 U.S.C. § 13a–1 which provides that "the Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice . . . and said court[ ] shall have jurisdiction to entertain such actions . . . ." Further, the section states:

> Any action under this section may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur . . . .

Inasmuch as jurisdiction under this section could be viewed as being dependent upon proper venue, we shall discuss both aspects without nicely distinguishing one from the other.

Appellant Savage contends that jurisdiction was improper, but even if that is not so, it was an abuse of discretion not to have

817, 824 (5th Cir. 1969). Upon review of the record, we are convinced the court did not abuse its discretion in refusing to vacate the

preliminary injunction on the basis of insufficient notice. R. 863–67, 908–17.

transferred the case to Chicago. It is agreed by all that Savage is a resident of Chicago and that the trades to which he was a party were executed on MACE in Chicago. Also, however, no one disputes that AITC conducts business within the bounds of the Central District of California. In addition, the customer accounts that AITC manages are located in California, and Melvin Berman, through whom Savage communicated the advice and with whom allegedly trades were arranged, was located there.

■ Section 13a–1 is fashioned in the image of certain provisions in the federal securities laws. The CFTC argues that its action properly lay in the Central District of California because that is where the "action or practice occurred." The CFTC rests its argument on two propositions: 1) that Savage's actions were an integral part of a scheme to defraud AITC customers and that other defendants performed acts in California—in effect, the "coconspirator" theory of venue; and 2) that by telephoning Berman in furtherance of the violations, Savage performed sufficient acts in the Central District to justify venue there. Because we find the second ground sufficient, we need not discuss the coconspirator theory.[10]

■ Telephone calls from Savage to Berman were an integral aspect of the commodity futures contract transactions at issue in this suit. The CFTC alleges that trades were prearranged between Savage in Chicago and AITC managed account customers in the Central District. In *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 204–05 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), the Fifth Circuit held that a telephone call to a party in Alabama from outside Alabama when sufficiently material to a fraudulent scheme sufficed to justify venue in Alabama. *Cf. Kogok v. Fields*, 448

F.Supp. 197, 198–99 (E.D.Pa.1978) (mailings into district sufficient for proper venue under 15 U.S.C. § 78aa, which allows venue where "any act or transaction constituting the violation occurred"). Holding that venue is proper under such situations encourages the resolution of integrated violations in a single suit. Section 13a–1 allows suit "where the act or practice occurred." Recently, the Supreme Court stated with respect to 28 U.S.C. § 1391(b) that:

> [I]n the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility . . . may be assigned as the locus of the claim.

*Leroy v. Great Western United Corp.*, —— U.S. ——, 99 S.Ct. 2710, 2718, 61 L.Ed.2d 464 (1979) (footnote omitted). The language of section 13a–1 supports even broader venue than merely where a claim "arose." We hold that in this case Savage's action in placing telephone calls to the Central District of California as an integral part of a scheme, centered in California and perpetrated upon clients of AITC located in California, which allegedly violated the Act "occurred" within the Central District for the purposes of the venue provisions of 7 U.S.C. § 13a–1.

Having concluded that the district court properly could entertain the CFTC suit, we still must consider whether the district court erred by refusing to transfer the case to Chicago. At the time the court so refused, the three remaining defendants were located in Chicago and most of the CFTC officials were located in Chicago or Washington. AITC customers and records were in California. Jurisdiction in the Chicago district court clearly would have existed.

■ Section 1404(a) of the Judicial Code provides that a court in which suit was filed with proper venue: "For the con-

---

**10.** This court recently held that in a private antitrust action venue cannot be solely based on allegations that a defendant was a member of a conspiracy and that a coconspirator performed acts in the forum district. *Piedmont*

*Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491 (9th Cir. 1979). We do not consider this holding applicable to civil suits initiated by the CFTC under 7 U.S.C. § 13a–1.

venience of parties and witnesses, in the interest of justice, . . . may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). This section admittedly applies to actions governed by special venue provisions. *Ex parte Collett*, 337 U.S. 55, 58–59, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). The Supreme Court has noted that section 1404(a) transfer is available "upon a lesser showing of inconvenience" than that required for a *forum non conveniens* dismissal. *Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955). Weighing of the factors for and against transfer involves subtle considerations and is best left to the discretion of the trial judge. · *See Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure: Jurisdiction* § 3847. Savage had the burden to justify by particular circumstances that the transferor forum was inappropriate. *Starnes v. McGuire*, 168 U.S.App.D.C. 4, 11, 512 F.2d 918, 925 (D.C. Cir. 1974) (en banc). *See* 1 *Moore's Federal Practice* ¶ 0.145[5].

■ We do not find, on this record, that the district court abused its broad discretion in refusing to transfer under section 1404(a) in this case. While it is true that Chicago proceedings would have been more convenient to Savage, only in rare instances have appellate courts overridden a trial court's decision not to transfer. *E. g., Chicago, Rock Island & Pacific R. R. v. Hugh Breeding, Inc.*, 247 F.2d 217 (10th Cir. 1957); *Southern Ry. v. Madden*, 235 F.2d 198 (4th Cir.), *cert. denied*, 352 U.S. 953, 77 S.Ct. 328, 1 L.Ed.2d 244 (1956). The facts in this case are not nearly as compelling as in those cases. Although the *convenience* of the plaintiff is not important to the balancing process, the CFTC's choice of forum must be given some weight. The district court was familiar with the case and transfer may have led to delay. *See Securities & Exchange Commission v. Savoy Industries,*

*Inc.*, 190 U.S.App.D.C. 252, 587 F.2d 1149 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). Thus, we cannot say that the district court, in weighing the considerations under section 1404(a)—the convenience of the parties, convenience of the witnesses and the interests of justice—abused its discretion in the balance it struck in this case.

### III. COUNT IV—SECTION 4m OF · THE ACT

It is undisputed that the appellant has never been registered as a commodity trading advisor. Although he previously sought registration, such registration was denied, and the denial upheld. *Savage v. Commodity Futures Trading Commission*, 548 F.2d 192, 197 (7th Cir. 1977).[11] Savage ˙now claims he need not have registered under section 4m because he is within an exception to the registration requirement in section 4m, *viz.*, he "has not furnished commodity trading advice to more than fifteen persons and . . . does not hold himself out generally to the public as a commodity trading advisor." We disagree. We hold that Savage does not come within the scope of this exception.

### A. Interpretation of the Registration Requirement.

■ 7 U.S.C. § 2 defines a "commodity trading advisor" as "any person who, for compensation or profit, engages in the business of advising others, either directly or through publications or writings . . ." This language demonstrates some concern for indirectly, as well as directly, conveyed advice. The CFTC staff has interpreted this provision liberally.

> We do not believe that the definition of commodity trading advisor requires that the "compensation or profit" flow directly from the person or persons advised. It is sufficient that the compensation or profit is to result wholly or in part from the furnishing of services . . . .

11. In *Savage*, the Seventh Circuit upheld the authority of the CFTC to refuse registration upon proof of a prior felony conviction, without more, under 7 U.S.C. § 8a(2)(B). The opinion upheld the CFTC decision that Savage was unfit to be a commodity trading advisor.

CFTC Interpretive Letter No. 75–11 [1975–77 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,098 (1975) at 20,763 n. 6. The exemption upon which appellant depends relieves from registration only advisors who, during the preceding twelve months, have not *furnished* commodity trading advice to more than fifteen persons. Furnished implies indirect as well as direct provision. The CFTC staff in a related context has taken the position which lends support to our view, that nonpaying as well as paying clients must be joined for determining the exemption's availability. CFTC Interpretive Letter No. 76–9 [1975–77 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,151 (1976).

The Act was enacted to remedy widespread abuses in commodity trading. We have recognized that "[r]emedial statutes should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers." *Westinghouse Electric Corp. v. Pacific Gas & Electric Co.,* 326 F.2d 575, 580 (9th Cir. 1964) (quoting *Scarborough v. Atlantic Coast Line R. R.,* 178 F.2d 253, 258 (4th Cir. 1949)). In other security law contexts courts ordinarily defer to statutory purpose and narrowly construe exemptions from registration. *See, e. g., Securities & Exchange Commission v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Abrahamson v. Fleschner,* 568 F.2d 862 (2d Cir. 1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978); *Quinn & Co. v. Securities & Exchange Commission,* 452 F.2d 943, 946 (10th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (1972). We believe our interpretation of section 4m is consistent with this emphasis.

The registration provisions of the Act serve an important purpose; registration assures a public source of information about those upon whom customers rely and protects the public from individuals unfit to act as advisors. Advisors should not be able to circumvent the congressionally-mandated registration scheme merely by the subterfuge of advising a person or entity who then operates as a conduit for trading advice to the actual advisees. If this were possible the registration requirement would serve little protective purpose at all. On the other hand, attributing the customers of an advisee to the advisor in all contexts would stretch the Act unjustifiably. Remedial intent must not become a rationalization for bending a statute to a court's will.

■ We interpret section 4m, 7 U.S.C. § 6m, to include within the persons to whom an advisor "furnishes" advice customers of an advisee when the advisor knows or should know that advice he gives is directly passed to those customers. The ultimate customers should be protected from the ultimate advisor in this situation. The fee the ultimate advisor receives will reflect the value of the advice to the ultimate customers. Absent the interpretation we have given the section, mere sham arrangements would shield those unqualified to be advisors from the registration and disclosure procedures.

### B. *Application of Interpretation to Appellant.*

■ AITC was a registered "futures commission merchant" under the Act. As such, AITC solicited and accepted orders for the purchase and sale of commodities for future delivery and promoted a "Managed Account Program" whereby customers placed money under the discretionary control of AITC. It had as many as 900 customers in that program. Melvin Berman was responsible for making the trading decisions for the managed account program. He was registered with the CFTC as a person associated with a futures commission merchant under 7 U.S.C. § 6k. The CFTC affidavits establish that Savage communicated trading advice to Melvin Berman and thereby to AITC itself. Savage did not communicate directly with AITC customers, although it is undisputed that he knew AITC managed a great number of customer accounts and that his advice was acted upon by AITC in its dealings for the benefit of managed account customers. Savage, by affidavit, merely asserted that he "at no

time advised customers of AITC." [12] Upon review of this summary judgment, we must decide whether appellant's denial that he "advised" AITC customers sufficiently creates an issue of fact as to whether he "furnished" advice to those customers within the meaning of section 4m.

The affidavits submitted by the CFTC support an inference that Savage knew that Melvin Berman and AITC acted upon his advice directly in making trading decisions for the managed account program. The advice did not, however, "flow through" to customers in the sense of given advice being actually communicated to AITC customers for those customers to then act upon. There is no indication that AITC acted as a mere conduit for physical passage of Savage's advice. Nevertheless, AITC customers entrusted funds to AITC and gave AITC discretion to enter commodity transactions on those customers' accounts. Savage, aware of this fact, gave advice to AITC knowing that AITC, on behalf of its customers, would incorporate that advice directly into actual transactions. Savage knew his advice impinged directly upon the fortunes of these ultimate customers; it was not merely a component of an independent investment model employed by AITC. These customers, well in excess of fifteen, are subject through this arrangement to the very risks Congress sought to eliminate by requiring registration. On these facts we find that Savage furnished commodity trading advice to more than fifteen individuals. His affidavits did not create a genuine issue of material fact.

In holding as we do, we are influenced by the interrelationship of the Act's registration provisions. If AITC had operated a commodity trading pool, appellant's relationship to the pool would have been disclosed in the pool's registration. 7 U.S.C. § 6n(1)(A) & (B). Or, if Savage supervised persons who ·solicited or accepted funds from customers of AITC, he would need to register as a person associated with a fu-

12. Although one CFTC affiant alleged that appellant provided advice for inclusion in a market letter, Savage denied such action in his affidavit, thus removing this allegation as a

tures commission merchant. 7 U.S.C. § 6k. While these provisions do not apply here, they provide related but inapplicable protections. Instead, Savage provided trading advice to a futures commission merchant under unique circumstances. He knew that his advice became the direct basis for trades made by AITC on behalf of its managed account customers. Under these circumstances the district court did not err by finding no issue of material fact existed as to whether Savage furnished trading advice to more than fifteen persons within the meaning of the Act. We, therefore, affirm as to Count IV.

## IV. COUNTS III AND V—VIOLATIONS OF SECTIONS 4b, 4c & 4o(1) OF THE ACT

### A. Applicability of Section 4o(1) to Appellant.

Section 4o of the Act, 7 U.S.C. § 6o(1), in its form at the time of the alleged violation, made it unlawful for "any commodity trading advisor . . . *registered under this Act* . . . to employ any device, scheme or artifice to defraud any client . . . or prospective client" (emphasis added). Congress has since deleted the "registered under this Act" language, Pub.L.No.95–405, § 10, 92 Stat. 870 (1978). The amendment "makes it clear that persons engaged in activities which should require them to be registered . . are subject to . . . Section 4o of the Act, even though those persons are not in fact registered with the Commission." H.R. Rep.No.1181, 95th Cong., 2d Sess. 20–21 (1978). Savage argues that because he was not registered at the time of this action, and because Congress had not yet changed the law, section 4o does not apply to him. The CFTC argues that section 4o applies to all those who *should* have been registered under the Act, and therefore in accordance with our own conclusion in Part III, *supra*, appellant is subject to the section.

possible basis for summary judgment on the complaint's allegations of a violation of 7 U.S.C. § 6m.

No prior court to our knowledge has interpreted this provision. The fact that Congress deleted "registered under this Act" might suggest that a gap in the law existed prior to amendment. We consider the amendment to be a clarification, however. The purpose of the statute supports this interpretation of congressional intent. It would be anomalous indeed if an advisor could escape the fiduciary duties of section 4o by avoiding required registration. This would frustrate a principal purpose of the Act.

We also find support for this interpretation of section 4o in the history of the 1978 amendments. The CFTC consistently has taken the position in a related context that persons who engaged in conduct which should have required their registration would be liable in reparation cases even if they were not so registered. *See Stucki v. American Options Corp.*, Comm.Fut.L.Rep. (CCH) ¶ 20,559 (1978). *See also Robley v. American Options Corp.*, Comm.Fut.L.Rep. (CCH) ¶ 20,612 (1978). These actions interpreted section 14 of the Act, 7 U.S.C. § 18, which establishes an administrative procedure through which individuals can be awarded "reparations." The 1978 amendments deleted a requirement identical to the one in section 4o that such reparations could be recovered from persons registered under the Act. Pub.L.No.95–405, § 21, 92 Stat. 865 (1978). The House Report expressly approved the CFTC interpretation of section 14 in *Stucki*. *See* H.R.Rep.No. 1181, 95th Cong., 2d Sess. 30 (1978). *See also* S.Rep.No.781, 95th Cong., 2d Sess. 28 (1978).

Our interpretation also is consistent with interpretations of other security law provisions. Under the proxy solicitation rules, for example, the Eighth Circuit has held that a corporation at all pertinent times subject to registration and proxy solicitation requirements could not escape the latter merely because they are literally applicable only to solicitations of proxies for "registered" securities. *Reserve Life Insurance Co. v. Provident Life Insurance Co.*, 499 F.2d 715 (8th Cir. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 803 (1975). *Accord, Bastian v. Lakefront Realty Corp.*, 581 F.2d 685 (7th Cir. 1978).

### B. *Standards for Summary Judgment.*

 Section 4o of the Act is thus not rendered inapplicable because of Savage not being "registered under the Act." Whether Counts III and V of the complaint stated a cause against Savage properly disposed of by summary judgment requires analysis of some familiar ground. To obtain summary judgment against Savage, CFTC had the burden of demonstrating "the absence of a genuine issue as to any material fact." Rule 56, Fed.R.Civ.P. A material fact is one which may affect the outcome of the litigation. *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir. 1977). An opposing party may not defeat summary judgment, once the movant has met his burden, in the absence of "any significant probative evidence tending to support [his legal theory]." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

Savage's opposition affidavit admits that he entered into most of the alleged transactions. He contends, however, that his affidavit brings into dispute a critical element of each section of the Act that he is charged with having violated. He argues that violation of these sections requires a fraudulent intent or knowing violation—the element of scienter. His affidavit denies: (1) an intent to enter into prearranged accommodation trades; (2) knowledge that he entered into trades away from the market price; and (3) an intent to serve as an intermediary to shift funds between accounts of AITC customers. If, as appellant contends, a fraudulent intent or knowing violation is necessary to run afoul of sections 4b, 4c and 4o (1) of the Act, then his intent and knowledge are material to the violation and his opposition affidavit has raised a genuine issue of material fact.

 We say this because appellant's intent and knowledge are particularly within his personal comprehension. As this

court has noted, "[g]enerally, when intent is at issue, a jury should be allowed to draw its own inferences from the undisputed facts unless all reasonable inferences defeat appellants' claims." *Mutual Fund Investors v. Putnam Management Co., supra,* 553 F.2d at 624. We cannot say that the facts put forward in the CFTC affidavits raise inferences so reasonable as to defeat Savage's claims. If resolution of the dispute would pit appellant's word against the CFTC's affiants, the decision is one for a trier of fact. We have previously stated:

> Doubt with respect to [appellant's] ultimate success . . . does not justify the granting of the appellees' motion for summary judgment so long as a genuine issue of material fact with respect to the matter exists. Rule 56, Fed.R.Civ.P. exists not to avoid trials, the outcome of which in the opinion of the trial judge are reasonably predictable, but to terminate litigation on claims with respect to which there exists no genuine issue of material fact.

*Abramson v. University of Hawaii,* 594 F.2d 202, 210 (9th Cir. 1979).

We conclude, therefore, that summary judgment was improper provided Savage is correct in his view that to violate sections 4b, 4c, and 4o(1) of the Act a fraudulent intent or knowing violation is necessary. We now turn to this issue.

### C. The Necessity of a Fraudulent Intent or Knowing Violation.

#### 1. Section 4b of the Act.

■ The substantive prohibitions in section 4b are found in four subsections. The subsections are not entirely separate; a single action may violate more than one. Each subsection is phrased in strong terms, making it unlawful to *cheat* or *defraud* (4b(A)), *willfully* to make a false report (4b(B)), *willfully* to deceive (4b(C)), and to bucket an order or offset an order or *willfully* and *knowingly* to take the opposite side of a transaction for another person (4b(D)). Taken together, these subsections clearly require that Savage's acts be done with knowledge of their nature and charac-

ter. That is, to be charged with a violation of 4b(A), Savage must have known that he was cheating; to violate 4b(B), he must have known the report was false; 4b(C) that he was deceiving; and 4b(D) that he was taking the opposite side of a transaction. Knowledge, of course, exists when one acts in careless disregard of whether his acts amount to cheating, filing false reports, etc. That is, the element of knowledge cannot be precluded by ignorance brought about by willfully or carelessly ignoring the truth.

Other courts treating violations of this section have adopted a similar approach. The Tenth Circuit stated that willful or fraudulent action is required under section 4b. *Master Commodities, Inc. v. Texas Cattle Management Co.,* 586 F.2d 1352 (10th Cir. 1978) (private civil suit). Although not requiring an evil motive, the Seventh Circuit has held that a willful violation of the section requires an intentional act or careless disregard for the statutory requirements. *Silverman v. Commodity Futures Trading Commission,* 549 F.2d 28, 31 (7th Cir. 1977) (unauthorized trading for customer accounts); *Goodman v. Benson,* 286 F.2d 896, 900 (7th Cir. 1961) (unauthorized trading). Similarly, the Second Circuit requires knowing action even though evil motive may be absent:

> It is enough that he acted deliberately, *knowing that his acts were unauthorized and contrary to instructions.* Such knowing, intentional conduct made his acts wilful, and therefore his violations of the statutory prohibition against cheating or defrauding the customer were wilful
> . . . .

*Haltmier v. Commodity Futures Trading Commission,* 554 F.2d 556, 562 (2d Cir. 1977) (emphasis added).

In the present action, Savage is accused of prearranging trades that defrauded AITC customers and of entering into offsetting trades with those customers' accounts. Such action required that Savage and AITC act in concert, concert that would require knowledge on the part of the participants. Savage's affidavit denied that he had the requisite knowledge.

2. Section 4c of the Act.

Section 4c of the Act prohibits "wash trading," "cross trading," "accommodation trading," or fictitious sales or using a transaction to cause a false price to be reported.[13] Congress viewed such transactions, as "pure, unadulterated fraud." 80 Cong.Rec. 7905 (1936) (remarks of Senator Smith). Such trades, if effected, do not reflect the forces of supply and demand and therefore may mislead market participants. One commodity exchange authority case in defining one type of trade prohibited by section 4c stated: "The essential and identifying characteristic of a 'wash sale' seems to be the *intent* not to make genuine, bona fide trading transactions in stocks or commodities." *In re Jean Goldwurm*, 7 Agric. Dec. 265, 274 (1948) (emphasis added).

■■■ We hold, therefore, that a violation of section 4c requires knowledge, as defined for purposes of section 4b. One cannot have an "accommodation" sale or a "fictitious" transaction if one in fact believes he is bargaining faithfully and intends to effect a bona fide trade. Nor can one enter a transaction to *cause* the reporting of a false price without an intent to do so. The language of the section is clear. Our holding sustains Congress' concern to prevent fraud. Of course, the required knowledge cannot be eliminated by willfully or carelessly induced ignorance. On this record the district court erred by granting summary judgment as to section 4c for the same reasons stated in connection with section 4b. Thus, we must reverse the judgment with respect to Count IV and remand for further proceedings.[14]

3. Section 4o (1) of the Act.

■■■ In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a showing of scienter was required in private damage actions under Rule 10b–5. That decision is distinguishable from the present case

---

13. *See* Commodity Exchange Authority, Memorandum on Definitions of Certain Trade Practices Prohibited by the Commodity Exchange Act, May 25, 1966 which defines: (a) "wash trading" as "entering into or purporting to enter into transactions, for the purpose of giving the appearance that purchases and sales are being or have been made but without actually taking a position in the market"; (b) "cross trading" as "indirectly bucketing a customer's order, or indirectly offsetting the buying order of one customer against the selling order of another customer, or wash trading by means of transactions with another floor broker who is engaged in a similar type of trading"; and (c) "accommodation trading" as "wash trading entered into by one broker to assist another broker to make cross trades, wash trades, . . ."

14. Recently the Second Circuit has held that although scienter is required in a private action for damages under section 10b, the scienter requirement is not applicable to government enforcement actions brought under sections 10b and 21(d) of the 1934 Act. *Securities & Exchange Commission v. Aaron*, 605 F.2d 612 [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,-800 at 95,128–31 (1979). The case contains a comprehensive discussion of factors distinguishing government enforcement actions and private suits for damages. The court focused its discussion on the third factor relied upon by the Supreme Court in *Hochfelder, supra*, to determine whether scienter was required, *viz.*, the relationship of section 10b to the other express civil remedies and the effect of a scienter requirement on the overall statutory scheme of the securities laws. The court also noted that Congress excluded a "willful" requirement found in the Senate draft of the precursor to the SEC injunctive provision in the 1933 Act, implying an intent to delete a scienter requirement. We note that whether scienter is required for SEC injunctive actions under section 10b remains a matter of no little dispute. *See, e. g., Securities & Exchange Commission v. Blatt*, 583 F.2d 1325 (5th Cir. 1978) and *Securities & Exchange Commission v. Wills*, 472 F.Supp. 1250, 1270 (D.D.C.1979) (holding scienter required).

In this case we believe that the history and policies behind section 10b are sufficiently different from those underlying 7 U.S.C. § 13a–1 to justify holding that even in government actions for injunctions commenced under 7 U.S.C. § 13a–1 for violations of sections 4b and 4c, an element of scienter is required. The language of the sections strongly implies such a requirement. Moreover, the legislative history emphasizes the desire to prevent fraud and other intentional actions. Our own desire to encourage CFTC actions to enforce the Act must be tempered by an acknowledgement of the Act's explicit provisions. *But see Commodity Futures Trading Commission v. U. S. Metals Depository Co.*, 468 F.Supp. 1149, 1162 n.55 (S.D.N.Y.1979).

on two important grounds. First, the Supreme Court stressed the importance of the language of section 10(b) of the Securities Exchange Act of 1934 and its legislative history. Section 4*o* (1) of the Commodity Exchange Act contains not only language paralleling section 10(b) which makes it unlawful for any commodity trading advisor "to employ any device, scheme or artifice to defraud any client . . . or prospective client," but also much broader language (of which there is no counterpart in section 10(b)) which makes it unlawful "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client . . . or prospective client." (§ 4*o* (1)(B)).[15] This broader language is devoid of any hint of a scienter requirement. Rather, the section resembles closely section 206 of the Investment Advisers Act, 15 U.S.C. § 80b–6(1),[16] which the Supreme Court in *SEC v. Capital Gains Bureau*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), held did not require a showing of scienter in *SEC injunctive actions* under that provision. This is the second factor which distinguishes *Hochfelder*, since that case involved only a private damage action, and indeed several courts have subsequently held that no showing of scienter is required in SEC enforcement actions under Rule 10b–5. *See, e. g., SEC v. Aaron*, 605 F.2d 612 CCH Fed.Sec. ¶ 96,-800 (2d Cir. 1979); *SEC v. World Radio Mission, Inc.*, 544 F.2d 535 (1st Cir. 1976). *But see SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978). *See generally* Comment, *Scienter and SEC Injunction Suits*, 90 Harv.L. Rev. 1018 (1977).

Nor does the legislative history of the 1974 amendments creating this section pro-vide arguments supporting the requirement of scienter. S.Rep.No.1131, 93d Cong., 2d Sess. 24, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5843, 5874. Instead, the legislative history indicates that the purpose of the 1974 amendments applicable to advisors was to discourage the enticement of unsuspecting traders, and to eliminate undesirable business practices. *See* Mitchell, *The Regulation of Trading Advisors*, 27 Emory L.J. 957, 994 (1978). Furthermore, section 4*o* (1) fulfills a slightly different function than do sections 4b and 4c. It implements the fiduciary capacity that characterizes the advisor's relationship to his clients. *See In re Savage*, [1975–77 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,139 at 20,923–24 (1976).

For all these reasons, we hold that an action for injunctive relief by the CFTC under section 4*o* (1) requires only that the violator have acted intentionally. That is, he must have intended to employ the "device, scheme, or artifice" but it is not necessary that he know that its result will be to defraud the client or prospective client. If the trading advisor or commodity pool operator intended to do what was done and its consequence is to defraud the client or prospective client that is enough to constitute a violation of section 4*o* (1). To repeat, it is not necessary that the advisor or operator intend to defraud or to practice deceit to make out a violation of section 4*o* (1) by the advisor or operator. Therefore, its absence does not preclude an injunctive action brought by the CFTC.

■ Moreover, we hold that summary judgment with respect to the section 4*o* (1) violation, Count V, was proper. Appellant

---

**15.** In fact, the Supreme Court in *Hochfelder* explicitly noted that language contained in subsection (c) of Rule 10b–5 which is virtually identical to that in section 4*o* (1)(B) "arguably . . . could be read as proscribing . . . any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not." 425 U.S. at 212, 96 S.Ct. at 1390. The Supreme Court found that an interpretation requiring scienter was "compelled by the language and history of § 10(b)," which did not contain such broad wording.

**16.** This section of the Investment Advisers Act provides:

It shall be unlawful for any investment adviser, . . . directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . . .

Savage's relationship with AITC customers—giving advice with knowledge that it was incorporated directly into trades on the customers' behalves, and then buying and selling opposite those customer orders—constitutes a "transaction, practice, or course of business" which operated as a "fraud or deceit" on those customers. Savage's affidavit does not put in issue these facts. Summary judgment to this extent was proper.

AFFIRMED as to judgment finding violations of sections 4m and 4o (1) (Counts IV and V), REVERSED and REMANDED as to judgment finding violations of sections 4b and 4c (Count III).