**WOLVERINE POWER COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 90–1597.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 1991.

Decided May 5, 1992.

As Amended June 17, 1992.

Thomas E. Mark, with whom Ronald D. Jones, New York City, and Louis Rosenman, Washington, D.C., were on the brief, for petitioner.

Timm L. Aberdroth, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., were on the brief, for respondent.

Henri D. Bartholomot and Peter B. Kelsey, for Edison Elec. Institute, et al., Jonathan W. Gottlieb, Washington, D.C., for Nat. Hydropower Ass'n and Amy S. Koch, Washington, D.C., for American Paper Institute, were on the joint brief, for amici curiae.

Before MIKVA, Chief Judge, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, Circuit Judge:

In 1986, Congress enacted the Electric Consumers Protection Act (ECPA), Pub.L. No. 99–495, 100 Stat. 1243 (1986), amending the Federal Power Act (FPA), 16 U.S.C. §§ 791a et seq. As part of the ECPA, Congress added section 31(c) of the FPA, 16 U.S.C. § 823b. Section 31(c) grants the Federal Energy Regulatory Commission (FERC) the authority to assess a civil penalty of up to $10,000 a day against "[a]ny licensee, permittee, or exemptee who violates or fails or refuses to comply" with, inter alia, FERC's regulations governing hydroelectric facilities. FERC assessed a civil penalty ($2,024,000) against Wolverine Power Company (Wolverine), an unlicensed utility, based on Wolverine's long-time failure to obtain the licenses required to oper-

ate several of its hydroelectric plants.[1] The issue in this petition for review is whether section 31(c) authorizes FERC to assess a civil penalty against Wolverine. Because we conclude that section 31(c) does not authorize the imposition of a civil penalty on an unlicensed individual or entity, we grant the petition.

I.

Petitioner Wolverine owns and operates four hydroelectric plants on the Tittabawasee River in east-central Michigan. The plants are located at Sanford, Edenville, Smallwood and Secord, Michigan.

In February 1976, the Federal Power Commission, FERC's predecessor, ordered Wolverine to obtain licenses for its four plants. In December 1976, Wolverine filed an application for the Sanford plant and also proposed a filing schedule for the remaining plants which FERC accepted in February 1977. In April 1978, however, FERC found the Sanford application deficient. FERC dismissed the application in May 1980, after Wolverine failed to correct the deficiencies.

Then, in January 1983, Wolverine, having received several letters from FERC threatening civil and criminal action for failing to obtain licensure, filed a revised application for the Sanford plant. In October 1983, FERC accepted the application. For over three more years, however, Wolverine did not file license applications for its other three plants. Finally, in 1986, during a field inspection, FERC expressed its concern with Wolverine's failure to file the applications. In September 1986, Wolverine pledged to file the remaining applications by March 1, 1987. Wolverine filed the applications by January 7, 1987.

On March 30, 1987, FERC rejected the remaining applications because Wolverine had failed to provide necessary informa-

---

1. According to section 23(b) of the FPA, 16 U.S.C. § 817, it is "unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto, across, along or in any of the navigable waters of the United States" without a license.

tion[2] and to consult with the United States Fish and Wildlife Service (FWS) and the Michigan Department of Natural Resources (MDNR) as required by 18 C.F.R. § 4.38. FERC gave Wolverine 45 days to consult with the agencies and 180 days to file additional information. When Wolverine failed to comply by July 30, 1987, FERC dismissed the three pending applications and advised Wolverine that its continued operation of the unlicensed plants would violate section 23(b) of the FPA, 16 U.S.C. § 817.

Shortly thereafter, on August 12, 1987, Wolverine informed FERC of its desire to comply with the licensing requirements and proceeded to prepare new applications. In brief, Wolverine conducted additional environmental studies, consulted as required with FWS and MDNR and revised its applications, filing them on July 24, 1989. On April 19, 1990, FERC conditionally accepted the applications as of their filing date and formally accepted them on July 13, 1990.

During the course of these events, as we noted initially, Congress enacted the ECPA, which amended the FPA by adding section 31. Thereafter, on August 6, 1987, FERC issued a notice of proposed rulemaking providing that, under the authority of section 31, it would assess civil penalties against "a person who engages in conduct requiring a license or exemption but fails to obtain one." *Procedures for the Assessment of Civil Penalties Under Section 31 of the Federal Power Act*, 52 Fed.Reg. 29,216, 29,217 (1987). "On August 17, 1988, the rule became final, *Procedures for the Assessment of Civil Penalties Under Section 31 of the Federal Power Act*, 53 Fed.Reg. 32,035 (1988), and is codified at 18 C.F.R. § 385.1502(b).[3]"

On February 23, 1989, FERC issued a notice of proposed penalty charging Wolverine with violating section 23(b) of the FPA, 16 U.S.C. § 817, for its failure to obtain licenses for the Edenville, Smallwood and Secord plants. The notice proposed penalties totalling $2,000 a day,[4] with the violations running from the date of the ECPA's enactment (October 16, 1986) until Wolverine filed acceptable applications. The case was set for hearing before an administrative law judge (ALJ).

■ The hearing was held and on May 18, 1990, the ALJ concluded that Wolverine had violated the licensing requirements of section 23(b) of the FPA, 16 U.S.C. § 817. *Wolverine Power Corp.* 51 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 63,012, 65,061 (1990) (initial decision). The ALJ noted Wolverine's "long continuing violations in the face of its actual knowledge" of the licensing requirements. *Id.* at 65,062. He also found there had been some environmental damage from Wolverine's operations even though the extent could not be fully determined because Wolverine had failed to perform the studies required by FWS and MDNR. *Id.* He further found that Wolverine had gained economic benefits[5] as a result of its unlicensed opera-

---

**2.** The information related to the impact of the plants' operations on water quality, fisheries and recreational use of the river. Joint Appendix (JA) 571–77.

**3.** FERC subsequently denied a request by various trade associations and utilities for rehearing on the rule. 45 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,407 (1988).

**4.** In setting the amount, FERC considered the following factors: (1) Wolverine's knowledge of the violations, (2) its history of violations, (3) the absence of any personal injury or loss of life as a result of the violations, (4) the economic benefits received from the violations, (5) its failure to make timely efforts to remedy the violations and (6) the risk of environmental damage created by the plants' use of peaking operations as determined by both FWS and MDNR. JA 33–38. FERC also noted that because Wolverine had not filed acceptable environmental studies, it could not determine whether Wolverine's unlicensed operations had "caused damage to property or to the environment or endangered persons, property, or the environment." JA 37.

**5.** The benefits occurred because Wolverine's unlicensed plants engaged in "peaking" rather than "run of the river" operations, to which the Sanford plant had originally been restricted under its license. In "peaking" operations, a plant uses its dam to store water, thereby disrupting the natural flow of the river and potentially endangering the river's aquatic habitat below the dam. "Peaking" allows the plant to release the water needed to power its turbines during hours of peak demand.

tions and that Wolverine had failed to make "meaningful remedial attempts" to obtain the required licenses. *Id.* at 65,062–64. The ALJ then reduced the penalty amount from $2000 to $400 a day and recommended that no penalty be imposed for the period from October 16, 1986, the date section 31 was enacted, until July 30, 1987, when FERC dismissed Wolverine's three applications. *Id.* at 65,066.

On review, FERC began by rejecting Wolverine's claim that section 31 does not authorize the imposition of a civil penalty against an unlicensed operator. *Wolverine Power Corp.*, 53 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,062, 61,197 (1990) (order modifying initial decision). FERC then reviewed the ALJ's findings. It rejected the finding that Wolverine had caused environmental damage, terming "the real issue" as "whether Wolverine's conduct precluded timely assessment and resolution of the potential environmental impact." *Id.* at 61,198. FERC concluded that "Wolverine's delay in filing its applications made it impossible for the Commission to assess the impact of its operations on a timely basis, and to timely remedy such adverse impact if it was occurring." *Id.* FERC also rejected the ALJ's finding that Wolverine had benefited economically by delaying licensing and continuing "peaking operations," stating that it could not speculate whether the licenses for Wolverine's remaining plants would limit them to "run of the river" operations. *Id.* at 61,198–99. FERC thus found this factor irrelevant to the sanction issue. *Id.*

FERC then lowered the boom. First, it rejected the ALJ's decision that the violation period run from July 31, 1987, until April 19, 1990. *Id.* at 61,199. Instead, FERC decided that the violations subject to sanction occurred from October 16, 1986,

the date section 31(c) was enacted, until July 31, 1987. *Id.* FERC then noted that it did not consider Wolverine's ability to pay because of the "murky" evidence on that factor. *Id.*

Finally, FERC summarized its view of the record:

> The factual record before us in this case … reveals a flagrant, sustained, knowing, concerted, "contumacious" pattern of conduct that challenges the fundamental integrity of the Commission's regulatory processes, and of the statutory authority we are charged with implementing. Wolverine has manipulated and abused our regulatory processes for fourteen years, while operating its hydroelectric facilities without the licenses required by the Federal Power Act. That fundamental challenge to the integrity of our legal system substantially outweighs all of the other considerations argued to us.

*Id.* at 61,200. FERC then assessed a $2,024,000 civil penalty against Wolverine *for its operation of the three unlicensed plants from October 16, 1986, through July 23, 1989.*[6] *Id.* Wolverine brought this petition for review, challenging FERC's interpretation of its authority under section 31(c) to impose a civil penalty on an unlicensed individual or entity required to be licensed under the FPA.[7]

## II.

In reviewing an agency's interpretation of a statute it is charged with administering, this Court must apply the methodology prescribed by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* we must first determine "whether

---

**6.** The per day amount was $2,000, the amount originally proposed by the Commission. Unlike the ALJ, FERC did change the end of the penalty period from April 19, 1990, the day the applications were conditionally accepted, to July 23, 1989, the day before the applications were filed. 53 Fed.Energy Reg.Comm'n at 61,200.

**7.** Wolverine also challenges (1) FERC's imposition of the civil penalty covering the period

from ECPA's enactment until promulgation of its rule interpreting section 31; (2) FERC's abandonment, on review, without notice of its original standard for imposing the penalty and its insertion of a new factor; and (3) the amount of the penalty as not supported by the record. Because we conclude that section 31 does not authorize the civil penalty assessed here, we do not reach these other issues.

Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781. If so, our task is at an end for we "must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. at 2781–82. But "if the statute is silent or ambiguous with respect to the specific issue," we defer to the agency if its construction of the statute is reasonable. *Id.* at 843, 104 S.Ct. at 2782.

### A.

■ Our starting point is the language of section 31(c). *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Church of Scientology v. IRS,* 792 F.2d 153, 157 (D.C.Cir.1986). This section provides in relevant part:

(c) Civil penalty

Any *licensee,* permittee, or exemptee who violates or fails or refuses to comply with any rule or regulation under this subchapter, any term, or condition of a license, permit or exemption under this subchapter, or any order issued under subsection (a) of this section shall be subject to a civil penalty in an amount not to exceed $10,000 for each day that such violation or failure or refusal continues.... In determining the amount of a proposed penalty, the Commission shall take into consideration the nature and seriousness of the violation, failure, or refusal and the efforts of the *licensee* to remedy the violation, failure, or refusal in a timely manner. No civil penalty shall be assessed where revocation is ordered.

16 U.S.C. § 823b(c) (emphasis added). The statutory text expressly restricts FERC's civil penalty authority to violations committed by three types of hydroelectric plants: licensees, permittees and exemptees. Therefore, we must first decide whether Congress intended the term "licensee" to embrace an unlicensed operator required to be licensed.

While neither section 31 nor any other part of the ECPA contains a definition of "licensee," Congress, in a 1935 amendment to section 3 of the FPA, had defined "licensee" to mean "any person, State, or munici-

pality *licensed* under the provisions of section 797 of this title." 16 U.S.C. § 796(5) (emphasis added). In construing section 31(c), we must assume that Congress used "licensee" in this section in the same way it had earlier defined the term in another part of the same act. *Cf. United States v. Neustadt,* 366 U.S. 696, 707, 81 S.Ct. 1294, 1300, 6 L.Ed.2d 614 (1961) (assuming Congress was aware of "established tort definitions" in enacting Federal Tort Claims Act). That Congress had previously defined "licensee" as a *licensed* person or entity and not a person or entity required to be licensed compels the conclusion that Congress, in enacting section 31(c), did not intend the expansive reading adopted by FERC.

The language of section 31(c) and the definition of licensee in section 3 of the FPA, however, are not the only relevant statutory provisions. Immediately preceding the definition of "licensee" in section 3 is the definition of "person" as "an individual or a corporation." 16 U.S.C. § 796(4). This definition is broader than the definition of "licensee"; it includes an unlicensed entity like Wolverine. So used by Congress, the terms are not synonymous.

"Person" and "licensee" also appear in several pre-ECPA enforcement provisions of the FPA. For example, in section 314, Congress gave FERC authority to seek an injunction or restraining order in district court "[w]henever it shall appear to the Commission that *any person* is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation or order thereunder." 16 U.S.C. § 825m(a) (emphasis added). In the same section, Congress also empowered FERC to seek "writs of mandamus commanding *any person* to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder." 16 U.S.C. § 825m(b) (emphasis added). Nor did Congress, in the pre-ECPA FPA, limit FERC's authority to seeking equitable remedies in enforcing the act against "any person." In section 316,

Congress provided for criminal penalties, including fines and imprisonment.[8]

Standing between, and in contrast to the enforcement provisions of sections 314 and 316, is section 315, 16 U.S.C. § 825n. Unlike sections 314 and 316, which authorize enforcement action against "any person," this section provides that *"[a]ny* licensee or public utility which willfully fails ... to comply with any order of the Commission ... shall forfeit to the United States an amount not exceeding $1,000 to be fixed by the Commission after notice and opportunity for hearing." 16 U.S.C. § 825n (emphasis added). That Congress chose to use the term "person" in sections 314 and 316 and "licensee" in section 315 and also differentiated the two in the definitional section of the FPA, 16 U.S.C. § 796, not only manifests a general distinction between the two terms but also demonstrates that Congress knew how to draft an enforcement provision applicable to a "licensee" but not a "person." Accordingly, we believe that, in enacting section 31(c), Congress meant what it said. It subjected only "licensee[s], permittee[s], or exemptee[s]" to civil penalties.[9]

### B.

In an effort to invoke the deference owed under the second step of *Chevron*, FERC argues that we should ignore the plain language of section 31(c) because Congress's intent is actually ambiguous. In so urging, FERC makes two arguments.

First, FERC points to the assessment provisions of section 31(d), noting Congress's use of "person" in several of the section's paragraphs. For example, paragraph (d)(1) provides that "[b]efore issuing an order assessing a civil penalty against *any person* under this section, the Commission shall provide to *such person* notice of the proposed penalty." 16 U.S.C. § 823b(d)(1) (emphasis added); *see also* 16 U.S.C. § 823b(d)(2) & (5). Thus, FERC argues, Congress's use of "person" in the assessment provisions demonstrates, at a minimum, that its use of the term "licensee" in section 31(c) is ambiguous. The short answer to this argument is that section 31(c) authorizes the assessment of a civil penalty not only against a "licensee" but also against a "permittee" or "exemptee." *See* 16 U.S.C. § 823(c). Congress thus used the broader term "person" in this provision because it includes all three types of entities. In any event, the best evidence of Congress's intent in enacting section 31(c) is, of course, the text of the section itself. *West Va. Univ. Hosp., Inc. v. Casey,* — U.S. —, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991). This is especially so in defining the scope of an agency's authority. The best evidence of the scope of authority is found not in the statutory language spelling out the process for executing that authority but instead in the language establishing the authority. Where, as here, that language unambiguously uses a statutorily defined term, that definition controls the scope of authority.

FERC also argues that it was entitled to "look[ ] beyond the precise words of [section 31(c) ] 'to the design of the statute as a whole and its object and policy' in determining its meaning." Brief of FERC at 23 (citing *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) and *McCarthy v. Bronson,* — U.S. —, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991)). FERC specifically argues that its civil penalty authority must be measured by the broad grant of authority contained in section 31(a) to "conduct such investigations as may be necessary in accordance with" the FPA. *See* 16 U.S.C. § 823b(a).

---

**8.** Any person who willfully and knowingly violates any rule, regulation, restriction, condition, or order made or imposed by [FERC] ... shall, in addition to any other penalties provided by law, be punished upon conviction thereof by a fine of not exceeding $500 for each and every day during which such offense occurs.

16 U.S.C. § 825*o* (b). In the case of a willful and knowing violation, Congress provided for imprisonment of not more than two years. *See* 16 U.S.C. § 825*o* (a).

**9.** Congress did not define "permittee" or "exemptee." *See* 16 U.S.C. § 796.

Undoubtedly, there are times that we legitimately look beyond the literal terms of a statute to determine congressional intent. *See, e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 454–55, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989) (rejecting literal reading of Federal Advisory Committee Act). But because "the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting any writing," *id.* (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)), we do so only in the most limited circumstances, such as when its literal meaning leads to an odd or irrational result. *Id.; see also Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989); *Watt v. Alaska*, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) (when literal terms of two statutes result in conflict, court must look beyond text to determine Congress's intent); *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892); *Conrail v. United States*, 896 F.2d 574, 578 (D.C.Cir. 1990) (quoting *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989)).

FERC argues that a "literal and mechanical reading" of section 31(c) will lead to the "irrational result" of rewarding those plants which do not comply with the licensing requirements of the FPA, because, until they become licensed, FERC will lack the authority to assess civil penalties against them. We disagree.

FERC's argument ignores the extensive enforcement authority Congress provided in sections 314 and 316 of the act.[10] Not only does FERC have the authority to seek criminal fines [11] for violations of the act committed by unlicensed entities like Wolverine, it is also authorized to seek to enjoin Wolverine's operation of its unlicensed plants.[12] FERC was not powerless to curtail Wolverine's operations. As the record indicates, as early as 1982, FERC threatened Wolverine with "civil and criminal enforcement action resulting in substantial penalties." Initial Decision at 65,057. FERC has often used this authority, *see, e.g., FPC v. Arizona Edison Co.*, 194 F.2d 679 (9th Cir.1952); *McRay Energy, Inc.*, 44 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,270, 62,001 (1988); *Clifton Power Corp.*, 39 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,117 at 61,456 (1987); *Deep River Hydro, Inc.*, 31 Fed.Energy Reg.Comm'n Rep. ¶ 61,280 (1985), and could have done so here.

Congress has similarly limited FERC's authority to levy civil penalties in another context. In addition to authorizing the assessment of civil penalties, section 31 authorizes FERC to revoke a plant's license. 16 U.S.C. § 823b(b). But section 31(c) further provides that "[n]o civil penalty shall be assessed where revocation is ordered."[13] Presumably, Congress determined that additional penalties were unnecessary in the case of revocation, a rational approach and one consistent with the notion that the applicability of civil penalties is tied to one's status as a licensee. It is equally rational to foreclose this measure here where other enforcement measures

---

**10.** For this reason, we find FERC's reliance on *CFTC v. Savage*, 611 F.2d 270 (9th Cir.1979), misplaced. The *Savage* court upheld the Commodity Futures Trading Commission's interpretation of 7 U.S.C. § 6*o* (1), forbidding "any commodity trading advisor ... registered under th[e] Act ... to employ any device, scheme or artifice to defraud any client," as applying to unregistered trading advisors. 611 F.2d at 281. In *Savage*, a contrary interpretation would have led to the irrational result that the agency could enjoin fraudulent activity committed by registered advisors but was powerless to enjoin such activity when committed by unregistered advisors. *Id.* at 282. FERC, in contrast to the

CFTC, is not powerless to enjoin violations of the FPA's licensing requirements.

**11.** *See* 16 U.S.C. § 825m(a).

**12.** *See* 16 U.S.C. § 825*o*.

**13.** The hypothetical case of a plant which has lost its license demonstrates the fallacy of FERC's argument. Under the statute, an odd result would occur if FERC could assess a civil penalty against a plant once its license was revoked even though, at the time FERC revoked the license, it could not have imposed a civil penalty.

are available.[14]

### III.

Having concluded that the language of section 31(c) is clear, we decline FERC's invitation to review its reading of the legislative history. The terms of section 31(c) limit FERC's civil penalty authority to violations committed by a "licensee, permittee, or exemptee," none of which includes Wolverine. FERC's rule authorizing the imposition of civil penalties against "a person who engages in conduct requiring a license or exemption but fails to obtain one" is *ultra vires* and its order assessing a civil penalty against Wolverine is void. We therefore invalidate both that portion of FERC's rule codified at 18 C.F.R. § 385.-1502(b) and its order imposing a civil penalty on Wolverine. Accordingly, Wolverine's petition for review is granted, FERC Orders No. 502 and No. 502–A, to the extent they authorize assessments against unlicensed operators, are vacated and the assessment orders in Docket No. E–7319–001 and No. E–7319–002 are vacated.

*Vacated.*

---

**14.** We acknowledge that Congress, in enacting the ECPA, expressed its concern that environmental safety was not being adequately considered in FERC's licensing process. *See* 16 U.S.C. § 797(e). But Congress had no need to supplement the injunction provision with civil penalties in order to deal with its environmental concerns.