**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Francis ("Bud") HILDENBRAND, Defendant.**

No. 89–K–535.

United States District Court, D. Colorado.

July 17, 1995.

John J. Mullins, S. Lee Terry, Jr., Gorsuch Kirgis, L.L.C., Denver, CO, Thomas J. Loughran, Susan B. Bovee, Finkelstein, Thompson & Loughran, Washington, DC, for plaintiff.

Arthur M. Schwartz, Denver, CO, for defendant.

## ORDER DENYING MOTION FOR RECONSIDERATION AND FOR ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT

KANE, Senior District Judge.

Before me is another in a continuing procession of cases that arose when the combination of sciolistic *laissez faire* banking policy and individual greed produced the savings and loan debacle of the late 1980's and early 1990's. During that time hundreds of banks, including Key Savings & Loan ("Key S & L"), folded when risky loans went bad in a period of economic downturn. Since then federal regulators have engaged in Procrustean exercises to bring to the bar not only the wolves they deemed responsible for the fiasco, but also the sheep who followed. The defendant in this case, Key S & L "commodity trading advisor" Francis "Bud" Hildenbrand was, to continue this ruminative metaphor, a goat—a scapegoat to be precise.

The Federal Deposit Insurance Corporation (FDIC) brought this action on May 29,

1989, seeking $7.5 million in damages from Hildenbrand based on allegations that he, *inter alia,* engaged in commodities fraud and breached his fiduciary duty to the bank. A two-day trial to the court commenced March 27, 1993. At the close of the FDIC's case, Hildenbrand moved to dismiss. I granted the motion in part, dismissing the FDIC's federal commodities fraud claims based on unauthorized trading, as well as its state common law claims for breach of contract, fraud, and negligent misrepresentation. In lieu of closing arguments, I asked the parties to submit post-trial memoranda on the remaining claims. I specifically requested briefing on the FDIC's claim for breach of fiduciary duty.

In conjunction with its post-trial memorandum, the FDIC filed a motion for reconsideration of my bench ruling dismissing the unauthorized trading claim. For the reasons set forth below, I deny the motion and order judgment to enter in favor of Hildenbrand on the FDIC's remaining claims for relief.

## I. MOTION FOR RECONSIDERATION

### *Unauthorized Trading Under § 4b of the Commodity Exchange Act*

Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, creates a private cause of action for those injured by the fraudulent acts of those who trade futures on their behalf.[1] Actionable conduct under § 4b includes unauthorized trading. In its complaint in this case, the FDIC contends Hildenbrand committed commodities fraud in violation of § 4b by engaging in speculative trading on Key S & L's futures account when he was authorized only to hedge.[2]

I dismissed the FDIC's § 4b claim at trial, citing a lack of proof on the issue of unauthorized trading. (Tr. at 314–15.) Specifically, I found the evidence, viewed in the light most favorable to the FDIC as plaintiff, failed to support not only the contention that Hildenbrand was authorized only to hedge Key S & L's cash portfolio, but also that any purchases Hildenbrand made on behalf of Key S & L were speculative. *Id.* In reaching my conclusion I relied both on the testimony of the FDIC's expert Timothy Koch, who explained one cannot hedge without knowing the precise nature and value of the cash instruments held and their risk profiles, and the testimony of Key S & L financial manager David Giesler, who admitted Hildenbrand was never given such information. *Id.*

The FDIC asks me to reconsider my ruling on grounds it proved each element of a § 4b claim. According to the FDIC, the evidence presented at trial showed Hildenbrand was hired as Key S & L's advisor on hedging; that he was given formal discretionary authority to place orders for sales on Key S & L's futures account in furtherance of the bank's hedging objective; and that instead of hedging, Hildenbrand engaged in unauthorized speculative trading.

■ A motion for reconsideration is proper when the court has "made a mistake not of reasoning but of apprehension ... [or] if there has been a significant change or development in the law or facts since submission." *EEOC v. Foothills Title Guar. Co.,* 1991 WL

---

1. The actual language of § 4b provides, in relevant part:

    **(a) Contracts designed to defraud or mislead; bucketing orders**
    It shall be unlawful (1) for any member of a contract market ... or (2) for any person, in or in connection with any order to make, ... any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce,
    ...
      (i) to cheat or defraud or attempt to cheat or defraud such other person....

7 U.S.C. § 6b (as amended in 1992 by Pub.L. 102–546, redesignating first, second and "(iii)" for "(a)," "(b)" and "(c)").

2. Hedging, according to the financial expert who testified at trial, is a means of managing the interest rate risk inherent in holding bonds in the cash market: When interest rates rise, the value of these assets decrease. Thus, the holder of these bonds can "hedge" this risk by simultaneously entering into futures contracts for their sale. When interest rates rise, the value of these futures contracts also rise because they can be bought back at a lower price. Thus, the bond holder has transferred the risk of an interest rate increase to the purchaser of the futures contract. *See* Tr. at 6–7, 232–34 (testimony of Professor Timothy Koch).

61012 at *3 (D.Colo. April 12, 1991), aff'd, 956 F.2d 277 (10th Cir.1992); see Major v. Benton, 647 F.2d 110, 112 (10th Cir.1981) (explaining the law of the case doctrine generally requires a court to adhere to its rulings in the interest of expeditious resolution of disputes and to prevent continued reargument of issues already decided). The FDIC's argument here is essentially that my dismissal of its § 4b claim was premised on a misapprehension of the established facts as they pertained to Hildenbrand's trading motivation.

■ The FDIC maintains (1) that while Hildenbrand may not have been advised of Key S & L's cash positions per se, he knew enough to know he was not hedging; and (2) there are indicia other than Hildenbrand's knowledge of Key S & L's cash positions pointing to the speculative nature of his trading. Assuming for the sake of argument that both contentions are true, neither persuades me to alter my ruling because neither establishes (or even addresses) the premise underlying the FDIC's unauthorized trading claim, namely, the limited scope of the trading authority Hildenbrand allegedly exceeded. The FDIC's motion for reconsideration is therefore denied.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FDIC's Commodities Fraud and Breach of Fiduciary Duty Claims

#### A. JURISDICTION

This court has jurisdiction over the parties and the subject matter of this litigation pursuant to 28 U.S.C. § 1345 and 12 U.S.C. § 1730(k)(1).

#### B. FACTS

Key S & L was a stock savings and loan association in Englewood, Colorado, insured by the Federal Savings & Loan Insurance Corporation (FSLIC). In early 1984, a group of Texas investors purchased Key S & L and transferred millions of dollars in loans to Key S & L's books. The participating institution on all of these loans was Vernon Savings and Loan ("Vernon S & L"). In May or June 1984, Larry Vineyard bought Key S & L from the Texas investor group. Vineyard later was indicted on federal criminal charges arising out of these and other savings and loan activities.

In June 1984, the Federal Home Land Bank Board (FHLBB) issued advisory memorandum number 04–322, informing insured institutions like Key S & L of newly enacted federal interest rate risk management regulations to be codified at 12 C.F.R. §§ 563.17–6, 571.3 (1985). These regulations required member institutions' boards of directors to review their interest rate risk exposure and to devise formal policies for the management of that risk. Subsection 563.17–6(b) compelled the filing of regular reports analyzing institutions' asset-to-liability ratios ("gap" analyses) and the impact of differing market interest rate scenarios, the first by October 31, 1984. Boards were required to review operations quarterly and to make all necessary and appropriate adjustments. Id., § 563.17–6(e).

Vineyard was interested in implementing a hedging program as a means of managing Key S & L's interest rate risk. He also needed to replace Key S & L's treasurer/controller, who was leaving. Thus in July 1984 he invited David Giesler, a 27 year-old CPA with Key S & L's outside auditor Peat Marwick, to join the bank as its controller. Vineyard had become acquainted with Giesler in May 1984 when Giesler conducted Key S & L's annual fiscal year-end audit. Giesler arrived at Key S & L in September 1984, and immediately began working both on the hedging program Vineyard envisioned and the reports required by the FHLBB advisory memorandum.

Concerned about potential abuses in the implementation of hedging programs, the Colorado Department of Regulatory Agencies, Division of Savings and Loan, issued its own memorandum on October 12, 1984 propounding guidelines for the use of such programs by Colorado savings and loan associations. The memorandum, like the one issued by the FHLBB earlier, required associations to develop written policies to govern their securities transactions. The policies were to include board approval for all such transactions and a clear statement of the association's investment and regulatory compliance strategy. (Def.'s Tr.Ex. A–18.) Also re-

quired was the identification of all securities brokers and advisors used, the imposition of specific dollar limits on transactions, and the observation of certain criteria in selecting and evaluating brokers or dealers. *Id.* Finally, the memorandum required frequent reporting to boards of directors of both the book and market value of all positions outstanding. *Id.*

Despite the cautionary tenor of the state regulators' memorandum, Vineyard pressed on in his efforts to convince Key S & L's board to adopt a hedging program. At Vineyard's direction, Giesler contacted Robert Love, a broker Vineyard knew from Vernon S & L, to ask about Vernon's hedging policy and the services Love provided. Giesler also attended seminars on treasury bond futures and hedging presented by Shearson Lehman, Drexel Burnam, and Peat Marwick. The four-day Peat Marwick seminar, presented in January 1985 in conjunction with thrift industry consultant John Darling & Associates, devoted two full days to the use of futures contracts to protect an institution's investment portfolio against rising interest rates, i.e., hedging.

Giesler presented his first hedging program proposal to Key S & L management in November or December 1984. That proposal was, in Giesler's words, "squashed" by President Clyde Cantrell who said he was "not comfortable with the whole idea" and "had heard of problems with other institutions that had been in a hedging program." (Tr. at 114.) Undaunted, Vineyard re-raised the issue after Giesler attended the Peat Marwick seminar and in February 1985, Giesler submitted a second proposal to management. This proposal specifically stated Giesler would be responsible for the planning and placement of futures contracts, relying on advice from outside brokers. The bank's Board of Directors adopted this second proposal on February 28, 1985.

On March 11, 1985, Giesler executed a Commodity Hedge Letter and a series of other agreements as part of opening a non-discretionary (meaning Giesler had to approve all trades in advance) trading account with Shearson's Denver office. Similar accounts were opened with Cargill Investors

(using Bob Love as broker) and Prudential–Bache. Key S & L Secretary Larry Stones executed the necessary corporate authorization agreements, and Giesler notified the FHLBB that Key S & L had adopted a hedging program. Giesler began trading futures for Key S & L on March 22, 1985. By mid-October, the hedge program had lost at least five million dollars and was suspended.

Before then in June 1985, Vineyard hired Keith Key, a long-time employee and officer of Capitol Federal Savings and Loan,[3] to replace Cantrell as Key S & L President and Chief Executive Officer. Key testified that when he arrived, the hedging program was in full operation with Giesler and the outside brokers discussing trades on a "daily basis." (Tr. at 13.) By mid-October, Key "had some concerns about the hedging program," specifically with the amount of losses Key S & L had sustained, the level of knowledge Key S & L had internally about hedging, and the quality and expertise of the outside brokers Giesler was using. (Tr. at 15.) Believing his own knowledge on the subject to be inadequate to address these concerns himself, Key contacted his "close friend" Bud Hildenbrand for assistance. (Tr. at 16, 18–19 (Key testimony), 328–29 (Hildenbrand testimony).) Key had known Hildenbrand personally and professionally since the early 1970's, had worked with him while he was at Capitol Federal, and believed he had the "type of knowledge and conservative philosophy" Key felt Key S & L "needed" in its hedging program. (Tr. at 16, 21.)

Hildenbrand initially declined Key's request for help on grounds he was "too busy," but agreed to meet with Key, Vineyard and Giesler at his office to discuss their concerns and answer their questions. (Tr. at 19–20, 328–29.) The meeting took place on November 5, 1985. Hildenbrand testified that of the three Key S & L officers who attended the meeting, Vineyard did most of the talking. (Tr. at 329.) Vineyard asked Hildenbrand questions about the futures market generally and his experience trading in it, and discussed a hedging program at a Texas bank (presumably Bob Love's at Vernon S & L) that was producing substantial profits.

---

3. I note Capitol Federal later also failed and was placed in receivership by the FDIC.

(Tr. at 329.) Hildenbrand answered Vineyard's questions and shared how he followed closely the trading positions of "major players" in the futures market like Solomon Brothers and Citicorp by having his broker obtain card counts from the floor of the exchange.[4] (Tr. at 331–32.)

Keith Key testified an "agreement" that Hildenbrand "would help" Key S & L with its hedging program "grew from that meeting." (Tr. at 22.) The nature and scope of this agreement was, by all accounts, vague.[5] What is clear is that while Hildenbrand believed interest rates would continue to fall and expressed his opinion that hedging was an unwise investment at the time, he agreed to make himself available to Giesler for consultation. (Tr. at 24, 333–35.)

Beginning in mid-November 1985, Giesler called Hildenbrand regularly to ask him about his trading activity, information he had about what the major banks were doing, and his "feeling" on interest rate direction. (Tr. at 334 (Hildenbrand testimony), 167–68 (Giesler testimony).) Giesler expressed interest in changing outside brokers, and asked Hildenbrand for the names of the brokers with whom he dealt personally. Hildenbrand told Giesler his main account was with a broker named Doug Shaw, who in October of that year had left Oppenheimer and moved to Shearson's offices in Greenwich, Connecticut. As a result, Giesler closed Key S & L's trading account at Shearson Denver and reopened it with Shaw at Shearson Greenwich.

Vineyard and Giesler proposed to Key S & L's Board of Directors that Hildenbrand be hired formally to design and implement the bank's hedging policy. Hildenbrand claims he was unaware of these efforts and continued to operate under the assumption his role was that of informal advisor to Giesler as a

favor to Key. The record supports Hildenbrand. The Board of Directors did not ratify the proposal to retain Hildenbrand, no retainer nor fees were paid, and, most significantly, Hildenbrand was never provided with the bank's portfolio so he could analyze its assets. (Tr. at 165 (Giesler testimony).) Instead, it was Giesler who, after attending the four-day Peat Marwick seminar on hedging, resumed Key S & L's hedging program in January 1986 at Vineyard's behest.

In allegations supported only by Giesler, the FDIC contends Key S & L gave Hildenbrand complete discretionary authority to conduct Key S & L's hedging activity beginning in January of 1985 and that Hildenbrand then embarked on a "reckless" and "speculative" series of devastating trades unbeknownst to Giesler or anyone else at Key S & L. According to Giesler, once Hildenbrand agreed to help Key S & L, he acted independently and Giesler never again placed a hedge order on behalf of the bank. He was motivated in this endeavor, the FDIC contends, by a "secret arrangement" with Shaw for favorable commission breaks and preferential trades on his personal account with Shearson. Giesler's attempts at blame-shifting lack credibility and the FDIC's allegations are unsupported by the record.

Hildenbrand's testimony, corroborated by contemporaneous notes he maintained as well as the testimony of Key and Shaw, was that he advised Giesler and Vineyard against hedging in early 1986 but agreed to place trades on Key S & L's Shearson account because he was in near daily contact with Shaw anyway. Hildenbrand did not know if the futures orders he placed for Key S & L were hedges because he lacked the requisite information regarding the bank's cash position to enable him to know. Moreover, Shaw

---

4. Card counts are kept on the floor by traders and tally the number of contracts purchased or sold in a day. Hildenbrand testified card counts are available to the general public through their brokers.

5. Hildenbrand contends all Key wanted at that point was information and that he was willing to help "as a friend." (Tr. at 336.) The FDIC contends the relationship was more formal, and that the parties entered into an oral agreement whereby Hildenbrand would advise Key S & L on hedging and trade for them in the futures

market for compensation. The FDIC's characterization of the facts is not supported by the evidence. At trial, Keith Key testified the agreement was "never very well defined." (Tr. at 22.) The question of whether and when Hildenbrand would be compensated for his time was "left open," with Key simply stating that if the Key S & L hedging program could be turned around with Hildenbrand's help, they would discuss compensation "at that time." (Tr. at 22–23, 336.) Key concedes the arrangement was "very loose ... [m]ore or less of a handshake arrangement." (Tr. at 23.)

testified that during the period in question, Giesler also placed trades on Key S & L's Shearson account (Shaw Dep. at 75) and that Hildenbrand's authority to do so was always circumscribed by Giesler. *Id.* at 77–78 (Giesler's trading authority over Key S & L's account was "superior" to that of Hildenbrand and Hildenbrand "operate[d] within the latitude of [Giesler's] authority").

Key S & L's hedging losses mounted rapidly in early 1986. By the end of February, losses in the amount of $3,620,155 were reported to the Colorado Department of Regulatory Agencies. Fred Joseph of the Savings and Loan Division wrote Key on March 14, 1986, stating Key S & L's explanation for the losses in its February report was insufficient and requesting additional information and documentation. (Def.'s Trial Ex. A–25.) One of Joseph's specific requests was for the "name(s) of securities dealer(s) from whom each [futures] contract was purchased." *Id.* Key responded by letter dated March 21, 1986. (Def.'s Trial Ex. A–26.) As to the identity of the securities dealers used, Key stated only that "all futures contracts were sold through Shearson American Express." *Id.* Still dissatisfied with Key's explanation, Joseph requested additional information in a letter dated March 31, 1986. Key responded to this letter on April 7, 1986, specifically identifying Hildenbrand as "[t]he investment advisor" on Key S & L's futures positions. (Pl.'s Trial Ex. 9.) [6] Joseph was apparently still dissatisfied with the information provided, and on April 25th requested an independent opinion regarding Key S & L's futures losses. Giesler suggested to Key that Peat Marwick provide the opinion and contact Joseph directly.

In late April 1986, Vineyard was indicted on criminal charges arising out of his savings and loan activities. Keith Key then began to serve not only as President, but also as Chairman of the Board and Chief Executive Officer of Key S & L. Despite the hedging program's huge losses, the regulatory scrutiny and the indictment of Vineyard, Giesler on May 22, 1986 reported favorably to Key S & L's board of directors on the program and the report was accepted by board vote. On May 28th, Giesler met with Key to discuss the hedging program. Key agreed to meet with Hildenbrand, and did so later that day. While Key informed Hildenbrand of some of the problems Key S & L was experiencing, he did not mention Vineyard's indictment and resignation. Hildenbrand did not learn of that occurrence until June 26, 1986.

On June 3, 1986, management met with FHLBB examiners to discuss the failing condition of Key S & L, and met with Peat Marwick representatives the next day. Key began to make strong demands to cease futures trading, but the board declined without a release of personal liability from Vineyard, still Key S & L's owner. On June 16th, Hildenbrand again met with Key and Giesler. He advised them he no longer wished to be involved with Key S & L's trading. The next day, management decided to split the hedging program between Prudential–Bache and Shearson Greenwich. The split was effected on June 18, 1986, and Giesler instructed Hildenbrand to close 225 contracts.

On August 8, 1986, Key S & L's insurance carrier advised the board that its Directors and Officers Acts and Omissions Coverage would not be renewed after September 1986. On August 18th, management decided to enter no new futures contracts. On August 26th, Giesler compiled an investment report regarding Key S & L's commodity invest-

---

**6.** The FDIC relies heavily on Key's April 7 letter to Joseph as proof that Key S & L had formally retained Hildenbrand as its hedging advisor in November 1985. This reliance is misplaced. While Key indeed represented to the state regulators questioning Key S & L's hedging losses that the association has an "investment advisor" whose services "are to protect the value of [Key S & L's] long-term investments through prudent use of the futures markets," he went on in the same letter to say that "[a]t this point, no fees have been paid to Mr. Hildenbrand" but that "[h]is normal fee for this kind of work is $4,000 per month." (Pl.'s Trial Ex. 9, ¶ 2.) Moreover, Key conceded during cross-examination that at the same time Key S & L was obtaining information from Hildenbrand for free and holding him out to regulators as its "advisor," it was seeking to retain Bram Govaars, a formal financial advisor, to manage Key S & L's portfolio and run its hedging program. (Tr. at 84–85.) Finally, when Vineyard, Giesler, and Key met with Hildenbrand in November 1985, none of them asked Hildenbrand the questions required by the Colorado regulators' October 1985 memo or evaluated his qualifications under the criteria it set forth.

ment performance and the suspension of the hedging program. On September 22, 1986, Peat Marwick issued its consolidated financial statements and supplemental information report for March 31, 1985 and March 31, 1986. The report showed Key S & L was not in compliance with its regulatory net worth requirements, and had not been for two years. The report was presented to the board on September 25th, where Giesler's resignation, tendered earlier, was accepted.

On December 27, 1986, the Colorado Department of Regulatory Agencies, Division of Savings and Loan issued findings and orders regarding Key S & L with which Key S & L was unable to comply. In February 1987, the FSLIC assumed control of Key S & L and two years later, initiated this action.

## C. CONCLUSIONS OF LAW

The FDIC contends Hildenbrand was a commodity trading advisor and, as such, owed fiduciary obligations of good faith, undivided loyalty and full disclosure to his client Key S & L. The FDIC maintains Hildenbrand breached his fiduciary obligations by: (1) misrepresenting his professional qualifications to Key S & L representatives at the outset of the relationship; (2) failing to disclose he was receiving secret benefits from Doug Shaw and Shearson Greenwich at Key S & L's expense in the form of commission rebates and being allowed to trade ahead of Key S & L; and (3) failing to obtain sufficient information concerning Key S & L's cash portfolio or futures positions so he could discharge his "undertaking" to advise Key S & L on its hedging program. The FDIC asserts this conduct was done intentionally or with sufficient recklessness to constitute violations of the Commodity Exchange Act §§ 4b and 4o(1)(B) and a breach of fiduciary duty under Colorado state law, and concludes it resulted in losses to Key S & L for which Hildenbrand should be held responsible.

Hildenbrand denies he was a "commodity trading advisor" within the meaning of the Act and denies he owed or breached any duties of care, loyalty, or candor to Key S & L. Hildenbrand asserts the fault for Key S & L's demise rests squarely with its management and denies any responsibility for its losses. I agree.

### 1. *Hildenbrand was not a "Commodities Trading Advisor"*

■ The Commodities Exchange Act, 7 U.S.C. § 1a(5)(A), defines "commodity trading advisor" (CTA) as

any person who—

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writing, or electronic media, as to the value of or the advisability of trading in—

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

(II) any commodity option authorized under section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

Subsection 1a(5)(B) specifically excludes from the definition of "commodity trading advisor"

(i) any bank or trust company or any person acting as an employee thereof;

(ii) any news reporter, news columnist, or news editor of the print or electronic media, or any lawyer, accountant, or teacher;

(iii) any floor broker or futures commission merchant;

\*　　\*　　\*　　\*　　\*　　\*

(vii) such other persons not within the intent of this paragraph as the Commission may specify by rule, regulation, or order.

The exclusion in Subsection (B) is intended to apply to the furnishing of services "solely incidental to the conduct of their business or profession." *Id.*, § 1a(5)(C). Hildenbrand fits neatly neither the definition of a CTA in Subsection (A) nor into any of the exclusions in Subsection (B). However, in construing § 1a(5) as a whole, I find Hildenbrand falls outside its scope.

Hildenbrand was not and never appears to have been "in the business of advising others" on the value or advisability of trading in

the purchase or sale of futures contracts or options.[7] He received no "compensation" from Key S & L, and the only evidence of "compensation" he received from Shearson (reduced commissions) was related not to his relationship with Key S & L, but to his longstanding relationship with Shaw.[8] The advice Hildenbrand gave Giesler, and his placement of futures orders on Key S & L's behalf, were solely "incidental" to his private real estate development business and his own investment activities. The fact there was no fee arrangement between Hildenbrand and Key S & L nor compensation received during the time he advised them supports the conclusion that Hildenbrand was not performing services of the type the Commodity Exchange Act seeks to regulate.

None of the authorities upon which the FDIC relies supports a different conclusion. *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270 (9th Cir.1979), cited for the proposition that courts have "interpreted liberally" the definition of CTA under the Act and "desire to give full force to [the Act as] remedial legislation" (Def.'s Post–Trial Mem. at 4–5), involves none of the issues presented by the instant case and is inapposite.[9] *Damiani v. Futures Investment Co., Inc.*, Comm. Fut.L.Rep. (CCH) ¶ 21,097, 1980 WL 15707 (C.F.T.C. Sept. 3, 1980), cited for the assertion that "an individual who renders advice through management of an account brings himself within the general language of the CTA definition" (Def.'s Post–Trial Mem. at 8), actually helps Hildenbrand under the circumstances presented here.

In *Damiani*, the CFTC found the president of a registered commodity trading advisor company and his broker-employee were CTAs under § 1a(5) of the Act (then § 2(a)(1)). These individuals advertised to obtain the business of investors, loaned money to the investors in order to obtain their business, and received substantial fees for their services. Hildenbrand did none of these things. Significant is the CFTC's observation in *Damiani* that the statutory definition of CTA

> focuses solely upon whether persons give commodity trading advice for profit to others as their main occupational pursuit as opposed to a sideline incidental to some other business or profession.

1980 WL 15707 at *3. I agree, and find Hildenbrand falls in the latter category.

None of the other authorities cited by FDIC supports its position either. *Graves v. Futures Inv. Co.*, Comm.Fut.L.Rep. (CCH) ¶ 21,457 (C.F.T.C. June 3, 1982) involved the same respondents and the same facts as those in *Damiani*. The Third Circuit's finding in *Abrahamson v. Fleschner*, 568 F.2d 862, 870 (1977) that defendant general partners were "investment advisers" under an analogous provision of the Investment Adviser's Act (IAA) was premised on the fact that investment advice was an "integral part" of their business duties toward their limited partners and that they received "substantial compensation" for providing them. SEC no-action letters *Suzanne Clark–James*, Fed. Sec.L.Rep. ¶ 77,811 (July 31, 1984) and *Touche Holdings, Inc.*, Fed.Sec.L.Rep. ¶ 78,-550 (Nov. 30, 1987), also interpret the "in the business" requirement of being an "investment adviser" under the IAA and attempt in general terms to distinguish between CPAs who merely discuss the advisability of invest-

---

7. The FDIC abandoned its initial allegations that Hildenbrand was required to be registered as a commodity trading advisor with the CFTC.

8. Significantly, Giesler testified at trial that he knew Hildenbrand was charged $15 less commission per transaction on his personal Shearson account with Shaw than Key S & L received on its account with Shaw, but that "it wasn't a major issue to me."

9. The Ninth Circuit in *Savage* construed § 4m of the Act, which requires CTAs who use the mails or other instrumentalities of interstate commerce to register with the CFTC unless they do not hold themselves out to the public as commodity advis-

ors and have not furnished commodity trading advice to more than 15 persons in the previous 12 months. *See* 7 U.S.C. § 6m. The Ninth Circuit held a floor broker, who traded only on his own account, nevertheless "furnished trading advice to more that fifteen persons" when he provided trading advice to a futures commission merchant knowing the merchant would incorporate such advice to enter commodity transactions on its customers' accounts. 611 F.2d at 281. The parties did not dispute that the broker was, in fact, a CTA.

At most *Savage* stands for the "liberal interpretation" of § 4m's 15–person advice provision, not the "liberal interpretation" of the definition of a CTA.

ing in securities as part of a client's overall financial plan (not considered "advisers") and those who discuss the advisability of investing in specific securities or who receive direct or indirect remuneration in connection with a client's purchase or sale of securities (considered "advisers). Again, Hildenbrand was not in the business of providing financial services, Key S & L was not a "client," and there was no credible evidence presented at trial to suggest Hildenbrand received any remuneration in connection with Key S & L's purchase or sale of securities.

Based on my review of the trial transcript, the evidence presented at trial and the applicable law, I conclude Hildenbrand was not a CTA within the scope or purview of the Commodity Exchange Act.

### 2. *Breach of Fiduciary Duty Claim*

■ Because the FDIC's fiduciary duty theory rests solely on the rejected contention that Hildenbrand was a CTA, its claim that Hildenbrand breached fiduciary duties owed Key S & L fails by definition. Even assuming, for the sake of argument, that Hildenbrand did owe Key S & L the duty of care and full disclosure required of a fiduciary, the FDIC presented no credible evidence at trial that Hildenbrand breached such a duty. Instead, the FDIC culled and distorted select portions of the testimony of Key and Shaw (which generally was favorable to Hilden-

brand) and held up as inviolate the self-serving testimony of David Giesler. This highly selective process of extrapolation resulted in something significantly less than candor.[10]

The evidence, taken as a whole, fails entirely to support Giesler's depiction of a scheming Hildenbrand who, after soliciting and obtaining Key S & L's business by misrepresenting his qualifications, went on to trade recklessly on Key S & L's account in exchange for secret commission breaks and trading perks from Shearson. Hildenbrand did not pursue the relationship with Key S & L; he was not "retained" in accordance with the criteria for advisors and brokers outlined in the October 12, 1984 state regulators' memorandum; he received no payment for his "services"; and during nearly the entire period he was involved with Key S & L (November 1985 to at least April 1986), Key S & L was actively soliciting and pursuing Govaars to manage the same cash portfolio and hedging program the FDIC now contends Hildenbrand was managing as of November 1985.

The evidence of "secret schemes" between Hildenbrand and Shearson presented by the FDIC at trial was also the result of the careful culling and distortion of testimony, and, in the final analysis, amounted to little more than innuendo. The testimony of Hil-

---

10. For example, the FDIC asserts in its Post-trial Memorandum that at his initial meeting with Vineyard, Key and Giesler in November 1984, Hildenbrand

> told them he had experience in running a hedge program for one local bank [citing Giesler's trial testimony at 122], and that he had enjoyed a highly successful consulting relationship with at least one mutual fund and at least three "Eastern banks" where his "advice on investment matters" had helped them "building the value" of their portfolios [citing Key's trial testimony at Tr. pp. 38–43 and Giesler's testimony at 161–62].

Pl.'s Post-trial Mem. at 11. This contrived characterization borders on fabrication. Giesler's entire statement on the subject was that "[Hildenbrand] told us he spoke with folks back east, folks that I guess I felt were in the know. He mentioned specifically contacts at Girard Bank, other banks, but I'm not sure what they were. That's about it." (Tr. at 122.) Key, who testified on direct examination by the FDIC that it was *he* who solicited the advice of Hildenbrand, not vice versa, stated that he did so based on his "person-

al judgment" of "what [Hildenbrand] had accomplished with his personal investments and, of course, working with him where we made loans to him at Capitol Federal Savings, I was able to determine the growth in his net worth and the manner in which he made his income and strategies that he used in his—in his investing." (Tr. at 39.) Dissatisfied, the FDIC proceeded to "impeach" its own witness with previously recorded deposition testimony, compelling Key to "admit" he contacted Hildenbrand based on "[Hildenbrand's], I would say, consulting relationship with some of the eastern banks" and his "indicat[ion] [that] there was or had been success in building the value of [a] portfolio." (Tr. at 39, 42–43.) Key did not testify Hildenbrand spoke of this "consulting relationship" at the November 1985 meeting, and explained the relationship, in his mind, consisted "maybe" of "a conversation with someone in [a bank's] investment department" and "that it could have been something as general as discussing the market." (Tr. at 42.) Moreover, Key testified he knew the "consulting" Hildenbrand did with these "Eastern banks" did not include hedging. (Tr. at 47.)

denbrand and Shaw, even considering their interest in denying any "scheme," was significantly more credible and persuasive than the bits of Giesler testimony presented by the FDIC.[11] The truth of the matter is that Key S & L, through Giesler, lost over $5 million on its hedging program before even approaching Hildenbrand. After Hildenbrand offered his help, it was Giesler—maybe driven by Vineyard, maybe not—who continued to run the hedging program. While Hildenbrand indeed placed hedging positions for Key S & L in the Spring of 1986, he did so at the behest of Giesler and Vineyard and was not "acting alone." Giesler also placed positions during that time and it was Giesler, not Hildenbrand, who retained ultimate authority over Key S & L's account with Shaw.[12]

There is little doubt that people, rather than bad fortune, were responsible for Key S & L's hedging losses and ultimate demise. Those people, however, did not include Mr. Hildenbrand. On the contrary, Mr. Hildenbrand has been dragged through the mud and I can find no excuse for it.

### III. ORDERS

█ I find the FDIC's claims in this case to have been unfounded and its position untenable. Accordingly, IT IS ORDERED that judgment enter in favor of defendant and against plaintiff on each of the claims remaining in this action. IT IS FURTHER ORDERED that Hildenbrand should be awarded his reasonable attorney fees for the defense of this action. I conclude this as an exercise of judicial discretion, based on my findings concerning credibility, the speciousness of the FDIC's claims, and the FDIC's failure to produce any persuasive evidence to support those claims. Within 30 days of the date of this Order, Hildenbrand shall submit to the FDIC appropriate time and billing records in support of his request for attorney fees. If the parties cannot agree on a reasonable amount for the award of fees to be entered as part of the judgment in this action, then within 45 days after the date of

this Order Hildenbrand shall file a motion for attorney fees together with such affidavits as he deems appropriate and the cause will be set for hearing.

As prevailing party, defendant Hildenbrand is entitled to his costs pursuant to 28 U.S.C. § 1920 and D.C.COLO.LR 54.1.

---

**11.** Because I find Hildenbrand neither made misrepresentations to Key S & L as to his qualifications nor omitted information he had a duty to disclose, I do not reach the question raised by the parties in their briefs as to whether certain subsections of the Act's commodities fraud provisions, 7 U.S.C. §§ 6b, 6o, require proof of scien-

ter, i.e., a specific intent to defraud. *See* Def.'s Post–Trial Mem. at 9, Pl.'s Reply at 7–9.

**12.** Because it is uncorroborated and unpersuasive, I reject Giesler's testimony to the contrary on these latter two findings.